

# AFTAB PUREVAL
# HAMILTON COUNTY CLERK OF COURTS

## COMMON PLEAS DIVISION

```
ELECTRONICALLY FILED
February 16, 2018 02:35 PM
      AFTAB PUREVAL
     Clerk of Courts
   Hamilton County, Ohio
  CONFIRMATION 703697
```

**FIRST STAR LOGISTICS LLC**              **A 1800925**

### vs.
**RAUL RONALD VICTORES**

## FILING TYPE:  INITIAL FILING (IN COUNTY) WITH JURY DEMAND

## PAGES FILED: 74

EFR200

# Exhibit A

IN THE COMMON PLEAS COURT OF HAMILTON COUNTY, OHIO

| | |
|---|---|
| FIRST STAR LOGISTICS, LLC<br>636 Northland Blvd., Suite 200<br>Cincinnati, OH 45240 | Case No.<br><br>Judge |
| Plaintiff, | **VERIFIED COMPLAINT FOR**<br>**TEMPORARY RESTRAINING ORDER,** |
| vs. | **PRELIMINARY AND PERMANENT**<br>**INJUNCTIVE RELIEF AND DAMAGES** |
| RAUL RONALD VICTORES<br>40787 Mongrain Rd.<br>Rollins, MT 59931 | Bradley M. D'Arcangelo (0068417)<br>2255 W. Laskey Rd.<br>P.O. Box 5760 |
| and | Toledo, OH 43613<br>Phone:  419-473-1346 |
| BULLHEAD LOGISTICS, LLC<br>Serve: Raul Ronald Victores<br>40787 Mongrain Rd.<br>Rollins, MT 59931 | Fax:  419-473-0218<br>Email:  bradley.darcangelo@bex.net<br>Attorney for Plaintiff |
| and | |
| AMERICAN RIDGEBACK, LLC<br>Serve: United States Corporation<br>Agents, Inc.<br>500 N. Rainbow Blvd., Suite 300A<br>Las Vegas, NV 89107 | |
| Defendants. | |

Now comes Plaintiff First Star Logistics, LLC (hereinafter referred to as "First Star"), by and through counsel, and for its Complaint against Defendants Raul Ronald Victores (hereinafter referred to as "Victores"), Bullhead Logistics, LLC (hereinafter referred to as "Bullhead"), and American Ridgeback, LLC (hereinafter referred to as "American Ridgeback") (hereinafter collectively referred to as "Defendants"), states as follows:

1.

## Parties

1.     First Star is an Ohio limited liability company with its principal place of business at 636 Northland Blvd., Suite 200, Cincinnati, OH 45240.

2.     First Star, in the ordinary course of its business, operates as a federally licensed property broker by authority issued to it by the Federal Motor Carrier Safety Administration under Docket No. MC-179779.

3.     Defendant Victores is an individual whose principal place of residence is 2400 Driftwood Drive, Las Vegas, NV 89107.

4.     Based upon information and belief, Victores is not a member of the Armed Services pursuant to the Soldiers and Sailors Act.

5.     Defendant Bullhead Logistics is a Montana limited liability company whose principal place of business is 40787 Mongrain Road, Rollins, MT 59931.

6.     Defendant Bullhead's agent for service of process is Raul Ronald Victores whose address is 40787 Mongrain Road, Rollins, MT 59931.

7.     Defendant American Ridgeback, LLC is a Nevada limited liability company whose principal place of business is 37 Willets Way, Newburgh, NY 12550.

8.     American Ridgeback's agent for service of process is United States Corporation Agents, Inc. whose address is 500 N. Rainbow Blvd., Suite 300A, Las Vegas, NV 89107.

## Jurisdiction and Venue

9.     This Court has personal jurisdiction over Defendants in this matter pursuant to Civil Rule 3(B) of the Ohio Code since the Defendants transacted business in this County.

10.    Venue is proper in this forum because Defendants contracted with First Star in Hamilton County, Ohio.

2

Count I
### Breach of Sales Agent Agreement against Defendants Victores and Bullhead

11.     Plaintiff reincorporates and restates the allegations contained in Paragraphs 1 through 10 as though fully set forth herein.

12.     On or about August 12, 2013, First Star entered into a Sales Agent Agreement with Victores.  See Appendix A.

13.     On or about May 8, 2017, First Star entered into a Sales Agent Agreement with Bullhead which was executed by Victores.  See Appendix B.

14.     Victores and his wife, Gabriela Onet, were at all times here relevant members of Bullhead Logistics.

15.     Pursuant to the agreements, First Star contracted with Victores and/or Bullhead as non-exclusive agents to provide and manage motor carrier brokerage services, international marketing service, international air and ocean service, freight providing services, warehousing, supply chain management services, and a broad range of transportation services, including without limitation, leasing, allocation and interchange of intermodal leasing equipment.  See Appendix A and B, Recitals ¶A.

16.     Pursuant to the Agreements, Victores and Bullhead agreed to be subject to First Star's Policy and Procedures Manual.  See Appendix A and B, ¶3.4.

17.     First Star, in the normal course of its business, provides all of the administration services for its agents.

18.     First Star's agents book freight through First Star's computer system.

19.     Victores and/or Bullhead, were required to obtain credit approval from First Star before transportation was performed for any customer.

3

20.     All decisions regarding credit approval were solely within the discretion of First Star.  See Appendix A and B, ¶3.2.

21.     Pursuant to the agreements, Victores and/or Bullhead agreed that they had no authority to request or accept payment for services from customers on behalf of First Star.  See Appendix A and B, ¶3.2(b).

22.     Pursuant to the agreements, Victores and/or Bullhead would be liable for any accounts receivable that were uncollected as a result of the agent's negligence, breach of agreement or failure to adhere to the company's policies and procedures.  See Appendix A and B, ¶3.2(d).

23.     In addition, Victores and Bullhead agreed that they would be liable to refund First Star for all commission money paid for which First Star did not ultimately collect from the customer.

24.     Contemporaneous with the execution of the Agreement and incorporated therein, Victores and Bullhead executed a non-solicitation agreement.  See Appendix A and B, Exhibit A.

25.     Victores and Bullhead acknowledged that during the term of the agreement and for a period of 365 days following the termination for any reason, Victores and Bullhead, including their owners, employees, officers, directors and representatives or in any other manner or capacity whatsoever, would not solicit or attempt to solicit business, in products or services competitive with products or services sold by First Star from (a) any customer or client of First Star; or (b) any prospective customer or client whom the agent dealt with or solicited during the shorter of (i) the period between commencement of the Sales Agent Agreement and the termination of the Sales Agent Agreement; and (ii) the 12 month period immediately preceding

4

the termination of the Sales Agent Agreement for any reason. See Appendix A and B, Exhibit A, ¶B(1).

26.     Victores and Bullhead irrevocably and unconditionally subjected themselves to the Courts of Hamilton County, Ohio for any lawsuit regarding the construction, enforcement and performance regarding the Agreements. See Appendix A and B, ¶7.6 and Exhibit A, ¶C(4).

27.     Victores and Bullhead acknowledged that the restrictions contained in the Agreements are reasonable and necessary to protect First Star's business interests and that any violation of the Agreement would result in irreparable harm to First Star for which there is no adequate remedy at law. See Appendix A and B, Exhibit A, ¶C(1).

28.     Victores and Bullhead acknowledged that in the event of any breach of any provision of the Agreement that First Star shall be entitled to a temporary restraining order and injunctive relief restraining the agent, its owner, employees and representatives from the commission of any breach or threatened breach. See Appendix A and B, Exhibit A, ¶C(1).

29.     Defendant Victores and/or Bullhead entered loads or failed to obtain credit for loads with respect to the following accounts and received agent commissions with respect to same: Classic Produce, Inc., Nathel & Nathel, Heartland Produce Company, Tavers Fruit Company, Gino Pinto, Inc., Reaves Brokerage Company, Scott & Allen, and Carbonella & DeSarbo. First Star billed each of these accounts and each of these accounts has failed to make payment in the total amount of $130,138.98. See Appendix C.

30.     Based upon information and belief, Victores has received money from customers due and owing to First Star for some, if not all of the entities identified in Paragraph 29, for which Victores, individually or as a member of Bullhead, has failed to transmit to First Star.

5

31. On or about August 15, 2017, Victores' wife, Gabriela Onet, established American Ridgeback, LLC for which Onet is the managing member. See Appendix D.

32. American Ridgeback filed and obtained brokerage authority with the Federal Motor Carrier Safety Administration (FMCSA) pursuant to Docket No. 041961. See Appendix E.

33. In December 2017, it was discovered by First Star that Victores was working as a disclosed agent for American Ridgeback, LLC d/b/a AR Logistics and diverting loads from First Star as of December 17, 2017. See Appendix F.

34. Based upon the discovered breach of the agreements, on December 20, 2017, First Star terminated the independent Sales Agent Agreements with Victores and Bullhead. See Appendix G.

35. As a consequence of Victores' and Bullhead's actions, First Star has suffered financial loss in an amount not less than $130,138.98.

Count II
Tortious Interference against American Ridgeback, LLC

36. Plaintiff reincorporates and restates the allegations contained in Paragraphs 1 through 35 as though fully set forth herein.

37. American Ridgeback is fully aware of Victores' Sales Agent Agreement with First Star which prohibits him from working for a competitor of First Star and/or servicing and/or soliciting First Star's customers for a period of 12 months immediately after the termination of the Sales Agent Agreement.

38. American Ridgeback's managing member is Gabriela Onet, Victores' wife.

39. Ms. Onet was at all times here relevant a member of Bullhead Logistics.

6

40. American Ridgeback's tortiously interfered with the Sales Agent Agreement by encouraging, instructing, ratifying and/or directing Victores to breach the Sales Agent Agreement.

41. As a consequence of the foregoing, First Star has suffered and will continue to suffer financial loss.

42. American Ridgeback's conduct entitles First Star to monetary damages and injunctive relief together with attorney's fees and costs in an amount to be proven at trial may warrant.

### Count III
### Tortious Interference with Business against All Defendants

43. Plaintiff reincorporates and restates the allegations contained in Paragraphs 1 through 42 as though fully set forth herein.

44. Defendants Victores, Bullhead and American Ridgeback were aware of First Star's business relationships including, but not limited to, Classic Produce, Inc.

45. Defendants were aware that Classic Produce entered into a Credit Application with First Star and First Star, pursuant to same, provided logistics services for and on behalf of Classic Produce.

46. First Star is owed for its services in the amount of $99,520.00, however Classic Produce has failed to make payment.

47. Based upon information and belief, Defendants are presently doing business with Classic Produce, causing Classic Produce to cease its business relationship with First Star and causing First Star damages therefrom.

7

48.     By their aforementioned actions, Defendants, and each of them, have and/or will intentionally, maliciously and without justification interfered with First Star's current and prospective contractual and/or business relationships with clients and customers.

49.     As a result of the aforesaid wrongful actions of Defendants, First Star has been injured, for which it is entitled to recover damages and interest in an amount as proved at trial together with attorney's fees and costs in an amount as proved at trial may warrant.

WHEREFORE, Plaintiff First Star Logistics, LLC respectfully requests that an award be entered as follows:

(1)     Awarding preliminary and thereafter permanent injunctive relief against Raul Victores and Bullhead Logistics, LLC, prohibiting them for a period of 12 months from the date of this Court's Order from soliciting or servicing customers of First Star, and permanently enjoin them from using First Star's trade secrets and confidential information and from otherwise violating the Sales Agent Agreement in any way;

(2)     Awarding temporary, preliminary, and thereafter permanent injunctive relief against Raul Victores, prohibiting him from being employed or performing services on behalf of American Ridgeback for a period of 12 months from the date of this Court's Order;

(3)     Awarding preliminary and thereafter permanent injunctive relief against American Ridgeback, prohibiting it, for a period of 12 months from the date of this Court's Order, from soliciting or servicing customers of First Star Logistics, LLC, and permanently enjoining it from using or disclosing First Star's trade secrets and confidential information from otherwise interfering with First Star's contractual relationship with Raul Victores and its customers;

8

(4)     Awarding damages and interest against Defendants in an amount to be proven at trial;

(5)     Award First Star its costs and disbursements incurred, including attorney's fees incurred in prosecuting this action;

(6)     Requiring immediate and expedited discovery to allow First Star to ascertain the full extent of Defendants' illegal violations of their obligations and the extent of damages they have caused First Star to suffer;

(7)     Ordering Raul Victores and a representative of American Ridgeback to appear for separate depositions upon oral examination by First Star within 10 business days.

<u>Jury Trial Requested</u>

First Star hereby requests trial by jury in this matter.

Respectfully submitted,

/s/ Bradley M. D'Arcangelo
Bradley M. D'Arcangelo
Attorney for Plaintiff

<u>VERIFICATION</u>

I, Todd Hammerstrom, am Vice President of First Star Logistics, LLC. I have reviewed the factual allegations contained in the Verified Complaint for Temporary Restraining Order, Preliminary and Permanent Injunctive Relief and Damages and verify the allegations to be true and correct to the best of my knowledge and belief.

Dated this 8th day of February, 2018.

_____
Todd Hammerstrom

County of Hamilton    )
State of Ohio          )

Subscribed and sworn to before me this 8 day of February, 2018.

_____
Notary Public

My Commission Expires:

10-14-18

[SEAL]

Stephanie Bailey
Notary Public, State of Ohio
My Commission Expires 10-14-2018

# APPENDIX A



## SALES AGENT AGREEMENT

THIS SALES AGENT AGREEMENT (this "Agreement") is made as of _____ , 201_ by and between First Star Logistics LLC, a Delaware limited liability company, or any successor in interest thereto (the "Company"), and _____ _____ whose address is _____ (the "Agent"). The Company and the Agent are each a "party" and together are "parties" to this Agreement.

### RECITALS

A. The Company is a third-party logistics business that provides and manages motor carrier brokerage services, intermodal marketing services, international air and ocean services, freight forwarding services, warehousing, supply chain management services, and a broad range of other transportation services, including without limitation the leasing, allocation and interchange of intermodal equipment (the "Business"); and

B. The Company desires to engage Agent to sell the products and services included in the Business to customers and provide other services in furtherance of the Business in accordance with the terms of this Agreement;

C. The Agent desires to actively and diligently promote the Business and sell such products and services and provide such other services, all in accordance with the terms of this Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and the mutual benefits to be derived hereunder, the parties, intending to be legally bound, hereby covenant and agree as follows:

### ARTICLE I
### APPOINTMENT AND SCOPE

1.1 Appointment. Subject to the terms and conditions and for the term of this Agreement, the Company hereby appoints the Agent as a non-exclusive independent agent to market, sell, and provide Services (as defined below) and to provide certain services in furtherance of the Business as set forth in this Agreement. The Agent hereby accepts such appointment upon the terms and subject to the conditions set forth in this Agreement and agrees that it will use its best commercially-reasonable efforts to advance and expand the Business of Company. For purposes of this Agreement, "Services" means transportation management and/or supply chain management, arranging and contracting for freight, transportation, and warehousing services, freight routing, logistics services and consulting, fleet management, scheduling and tracing services, leasing of intermodal equipment, customer and customer support services and other services in furtherance of the Business as the Company may request for its benefit. Agent further acknowledges and agrees that it will not take actions, or fail to act, in a way likely to result in harm to Company's Business including, without limitation, directing business away from Company.

1.2 Independent Contractor Status.

(a) This Agreement does not constitute an association, general agency, partnership or joint venture. Except for the solicitation of orders and the provision of Services in accordance with the provisions hereof, the Agent shall not be considered an agent or legal representative of the Company for any purpose. Except as expressly provided herein, the Agent is not granted and shall not exercise the right or authority to assume or create any obligation or responsibility, including, without limitation, contractual obligations and obligations based on warranties or

guarantees, on behalf of or in the name of the Company. The Agent shall not misrepresent its authority to any third party and shall avoid giving the appearance of having authority to bind the Company other than as provided in and consistent with this Agreement.

(b) Neither the Agent nor any agent, employee, or representative of the Agent shall be, or shall be considered, an employee of the Company. The Agent's relationship with the Company shall be that of an independent contractor, and as such, except as expressly set forth in this Agreement, the Company shall not have control, and the Agent shall have exclusive control, over when, where, and how the Agent sells, markets, or provides the Services or performs its other obligations under this Agreement.

## ARTICLE II
## AGENT REPRESENTATIONS

Agent hereby represents and warrants to the Company as follows:

2.1 <u>Authority and Enforceability</u>. Agent is duly authorized to enter into this Agreement, and this Agreement is valid, binding and enforceable against Agent in accordance with its terms.

2.2 <u>Consents; Conflicts</u>.

(a) Agent has obtained all governmental and third party consents and approvals required for Agent to enter into this Agreement and perform in accordance with its terms and to sell, market, and perform the Services.

(b) Agent is not bound by the terms of any agreement with any previous employer or other party to refrain from (i) using or disclosing any trade secret or confidential or proprietary information in the course of marketing, selling, or performing Services or performing its other obligations under this Agreement or (ii) competing, directly or indirectly, with the business of such previous employer or any other party. This Agreement and Agent's sales, marketing, and performance of Services and performance of its other obligations under this Agreement do not, and will not, breach any agreement to keep in confidence proprietary information, knowledge or data acquired by Agent in confidence or in trust before the Company's engagement of Agent. Agent will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employer or any other party.

2.3 <u>No Inducement to Breach Contracts with Others</u>. The Company has not encouraged or induced Agent to breach or violate the terms of any contract or agreement, whether oral or written, to which Agent is a party or otherwise bound or subject.

2.4 <u>Permits; Compliance with Laws</u>.

(a) Agent possesses, and will maintain during the term of this Agreement, all required licenses, approvals, consents, permits, and certifications necessary for Agent's performance of its obligations under the terms of this Agreement.

(b) Agent is not in violation of any applicable law, rule, regulation, or ordinance, whether federal, state, or local. Agent will not violate any applicable law, rule, regulation, or ordinance, whether federal, state or local during performance of its obligations under the terms of this Agreement.

## ARTICLE III
## AGENT RIGHTS, OBLIGATIONS AND COVENANTS

3.1 <u>Operations and Expenses</u>.

(a) *Agent's Control*. The detailed operations of the Agent are subject to its sole control and management.

2

(b) *Agent's Liability for Expenses.* Except as expressly provided in this Agreement, the Agent shall be responsible and liable for its costs and expenses of selling, marketing, and providing the Services and performing its other obligations under this Agreement, including without limitation salaries and benefits of the Agent's employees and representatives, travel, administrative, entertainment, all other operating expenses (including any required license and permitting fees) and all applicable federal, state and local taxes. The Company shall provide, at the Company's expense, business forms and advertising materials bearing the Company's name and logo for the Agent's use in selling, marketing, and providing Services and performing its other obligations under the terms of this Agreement.

(c) *No Authority to Incur Expenses on Behalf of the Company.* Except to the extent expressly provided in this Agreement, the Agent shall not enter into any contract or agreement by or on behalf of the Company or extend credit or agree upon payment terms on behalf of the Company.

(d) *Diligence, Customer Liaison.* The Agent agrees that it will use its diligent best efforts to market, sell, and provide Services and to act as liaison between the Company and customers.

(e) *Agent's Office; Hiring and Training Personnel.* The Agent will provide, at its own expense, such office space and facilities, and hire and train such personnel, as the Agent determines in its discretion may be required to carry out its obligations under this Agreement.

(f) *Promotional Materials.* The Agent will not use any advertising or promotional materials to market, promote, or provide Services that have not been provided by the Company (at the Company's expense), unless the Agent has first obtained from the Company its prior written approval of such materials.

(g) *Agent's Authority.* This Agreement shall not constitute a general grant of authority to the Agent to bind the Company. The Agent may negotiate rates with the Company's list of approved vendors and carriers ("Approved Vendors"). In connection with the performance of its obligations under this Agreement, the Agent shall not engage any transportation or freight services from any vendor or carrier other than an Approved Vendor. All invoices from Approved Vendors shall be sent directly to the Company, and subject to the other terms of this Agreement, the Company shall pay such invoices directly to the Approved Vendor.

(h) *Group Medical Insurance.* If available and if permitted by the Company's group medical insurance plan, the Agent's employees shall have the option to participate in any group medical insurance plan that the Company provides for or makes available to employees of the Company's agents, provided, however, that the Agent shall be liable for the payment of premiums with respect to its covered employees.

(i) *Agent's Insurance Coverage.* The Agent will obtain and maintain insurance policies with reputable insurers that provide such coverage for its operations that is customary and prudent in its industry, including, without limitation, public liability insurance and, to the extent required by applicable law, workers' compensation insurance for its employees, and will cause the Company to be added to such policies as an additional loss payee. Upon the Company's request, the Agent will provide copies of all its policies and certificates of current coverage to the Company.

(j) *Compliance with Laws.* Agent will comply with all applicable federal, state, and local laws, rules, regulations and ordinances in connection with marketing, selling, or providing Services and its other obligations under the terms of this Agreement.

(k) *No Questionable Payments.* The Agent will not, directly or indirectly, in the name of, on behalf of, or for the benefit of the Company offer, promise, or authorize to pay, or pay any compensation, or give anything of value to, (i) any official, agent, or employee of any government or governmental agency, (ii) any political party or officer, employee, or agent

3

thereof, (iii) any candidate for political office, or (iv) any officer or employee of any customer, to the extent such compensation or payment to the customer's officer or employee violates any applicable law or corporate policy of such customer.

3.2 Customer Accounts.

(a) Before selling or providing Services to any prospective customer, the Agent must comply with the Company's policies and procedures on account clearance, credit limits and payment terms. Agent further agrees not to sell or provide Services to any customer to the extent its outstanding receivables are outside the approved terms or credit limits or to the extent such Services would result in an accounts receivable balance in excess of the approved credit limits for such customer.

(b) The Agent will be primarily responsible for finalizing shipments for the customers for Services and shall use its best efforts to invoice 48 hours after the delivered date of the shipment of the customer's goods or the performance of other Services, as the case may be.

(c) The Agent will have no authority to request or accept payment for Services from customers on behalf of the Company.

(d) The Agent will be liable to the Company for any accounts receivables balances booked in violation of the provisions of Section 3.2(a) and for any accounts receivables that are uncollected as a result of the Agent's negligence, breach of this Agreement, or failure to adhere to the Company's policies and procedures. The Company may, in its discretion, collect any or all of any liability of the Agent under the preceding sentence (the "Excess Bad Debt") by offsetting such amounts against Commissions to which the Agent is entitled in accordance with ARTICLE IV of this Agreement. To the extent a customer or the Agent has not paid the Company an Excess Bad Debt before the earlier of (i) 12 months from the date of the uncollected invoice and (ii) the termination of this Agreement for any reason, then the Agent will pay the Company the amount of the uncollected Excess Bad Debt, plus interest at the rate of the lesser of (A) 1.5% per month and (B) the highest applicable legal rate from the invoice date until such Excess Bad Debt is paid in full to the Company. For purposes of this Section 3.2(d), customer payments shall be applied against referenced invoices, and if the customer does not reference an invoice with its payment, then against the oldest outstanding invoices first.

(f) Agent will be liable to refund to the Company for any and all Commissions paid to Agent on Services for which the Company does not ultimately collect.

3.3 Agreement Regarding Confidentiality, Non-Solicitation and Non-Recruitment. Contemporaneously with the execution and delivery of this Agreement, the Agent shall execute and deliver to the Company the Agreement Regarding Confidentiality, Non-Solicitation, and Non-Recruitment, attached as Exhibit A to this Agreement.

3.4 Policies and Procedures. The Agent hereby agrees to comply with, and to cause its employees and representatives to comply with the Company's Policy and Procedure Manual. Said manual is provided and it is the Agent's responsibility to be aware of, and keep current with the policies and procedures contained therein. The Company may audit the Agent's business and practices at any time for purposes of ensuring the Agent's compliance with the Company's policies and procedures. The Agent agrees to provide the Company with access to the Agent's books and records during normal business hours for purposes of conducting such audit.

ARTICLE IV
COMPENSATION

4.1 Compensation. Subject to the provisions of this ARTICLE IV and the Agent's performance of its obligations under this Agreement, the Company will pay the Agent a commission ("Commissions")

4

equal to a percentage of the Net Revenue (as defined below) as specified on Schedule A hereto for Services sold by the Agent to customers pursuant to orders procured by the Agent in accordance with this Agreement. The Agent will not be entitled to any Commissions from sales in violation of Section 3.2(a) or with respect to invoiced amounts that the Agent instructs the Company to "write off." The term "Net Revenue" means (a) the amount of each customer invoice for Services procured by the Agent in accordance with this Agreement less (b) all transportation related charges, including, without limitation, truck transportation, rail and shipping freight charges, and drayage charges, in each case, without regard to early payment discounts or volume incentives or discounts.

4.2 Manner of Payment. Payment of all Commissions shall be made, at the Company's election, (a) by bank check payable to the Agent and mailed to the Agent's address reflected in the Company's records, or (b) by wire transfer to a national or state bank in the United States designated in writing by the Agent for credit directly to an account in the name of the Agent.

4.3 Time of Payment. The Commissions shall be payable weekly based on invoices to customers from the immediately preceding week.

4.4 Split Commissions. In cases in which an order is or is claimed to have been solicited by more than one agent of the Company, including the Agent, the Company may pay a split Commission to the agents involved. In no event will the Company be required to pay more than the amount of one full Commission applicable to any customer invoice.

4.5 Offsets. All Commissions, compensation or other amounts payable hereunder by the Company to the Agent will be subject to offset for any claims or other amounts owed by the Agent to the Company pursuant to the provisions hereof or otherwise.

4.6 Chargebacks. The Company shall have the right to chargeback the Agent's Commission account the amount of any refund or credit to the account of any customer based on the customer's claim that no order for Services was submitted or for any other reason presented by customer. The Company shall, in its sole discretion, but after consultation with the Agent, determine if the refund or credit is to be made in response to a customer complaint. If the Agent has no Commission to chargeback against, then the Agent will promptly pay to the Company the amount of any Commission it received with respect to any such refunded or credited amount.

ARTICLE V
INDEMNIFICATION

5.1 Indemnification.

(a) The Agent agrees to indemnify and hold the Company, its officers, directors, employees, successors, and assigns harmless against all losses, damages, or expenses of whatever form or nature, including attorneys' fees and other costs of legal defense, whether direct or indirect, that they, or any of them, sustains or incurs as a result of the Agent or any of its employees or agents (i) breaching any provision of this Agreement, (ii) making representations or statements not specifically authorized by the Company herein or otherwise in writing, (iii) marketing, selling, or providing Services to customers other than as expressly authorized in this Agreement, (iv) violating any applicable law, rule, regulation, ordinance or order, or (v) negligent acts or omissions.

(b) The Company agrees to indemnify and hold the Agent harmless against all losses, damages, or expenses of whatever form or nature, including attorneys' fees and other costs of legal defense, whether direct or indirect, that it sustains or incurs as a result of any acts or omissions of the Company or any of its employees or agents, including but not limited to (i) breaching any provision of this Agreement, or (ii) violating any applicable law, rule, regulation, ordinance or order.

5

ARTICLE VI
TERM AND TERMINATION

6.1 Term. Unless terminated as provided in Section 6.2 below, this Agreement will continue in full force and effect for an initial term of five years commencing on the effective date hereof. Thereafter, this Agreement will be automatically renewed for subsequent one-year terms unless written notice of termination of this Agreement is given by a party to the other party at least 120 days in advance of the termination of the initial term or any renewal term, as the case may be.

6.2 Termination. This Agreement may be terminated prior to expiration of the initial or any renewal term, as provided in Section 6.1, by written notice to the other party as follows:

(a) By the mutual written consent of the Company and the Agent; provided, however, that if the Agent requests the Company's mutual consent to a termination of this Agreement as a result of (i) the death or disability of the Agent or a material employee of the Agent, (ii) the Agent's or its material employee's determination to retire, or (iii) the sale of the Agent's business, or (iv) the Agent's determination to pursue a line of business outside the transportation or logistics industry that is not competitive with the Business or the Services, then the Company will not unreasonably withhold its consent to such termination, provided the Agent diligently assists the Company in transitioning all its customers for Services and other business related activities to another agent of the Company; or

(b) By the Company, at any time after the occurrence or existence of the following conditions, each of which shall constitute grounds for termination for "Cause" as that term is used in Paragraph 6.4(a):

(i)   the Agent's breach of any of its representations or covenants in this Agreement, if the Agent fails to cure such breach within 15 days after receiving a written notice thereof from the Company; provided, however, that the Company will only be required to provide notice and an opportunity to cure two non-similar breaches in any 12-month period;

(ii)  the Agent becomes insolvent or the subject of any voluntary or involuntary bankruptcy, receivership, or other insolvency proceeding or make an assignment or other arrangement for the benefit of its creditors;

(iii) if, in the good faith discretion of the Company, the Agent engages in conduct that is detrimental or harmful to the Business, there is a significant change in the ownership or management of the Agent, or the Agent's financial condition is such that it cannot adequately market or provide Services or comply with the Company's policies and procedures;

(iv)  an attempt by the Agent to sell, assign, delegate or transfer any of its rights and obligations under this Agreement without having obtained the Company's prior written consent thereto;

(v)   the Company obtains knowledge that the Agent's representation in Section 2.2(b) is false in any material respect; or

(vi)  the Agent breaches or otherwise fails to perform its obligations under the Non-Competition Agreement; or

(c) By the Agent, effective immediately if the Company fails to pay the Agent the Commissions when due and if the Company fails to make such payment within 15 days after receiving written notice thereof from the Agent; provided, however, that the Agent will only be

6

required to provide notice and an opportunity to cure such failure to pay twice in any 12-month period.

6.3 **Rights of Parties on Termination.** In addition to the other applicable provisions of this Agreement and the Agreement Regarding Confidentiality, Non-Solicitation, and Non-Recruitment, the following provisions apply upon the termination or expiration of this Agreement:

(a) The Agent will immediately cease soliciting orders for, and providing, Services.

(b) All indebtedness of the Agent to the Company shall become immediately due and payable without further notice or demand, which is hereby expressly waived, and the Company shall be entitled to reimbursement for any reasonable attorneys' fees that it may incur in collecting or enforcing payment of such obligations. Notwithstanding anything to the contrary in this Agreement, following the termination of this Agreement for any reason, the Company will be entitled to withhold payment of Commissions to the Agent until it is able to determine the amount of the liability, if any, of the Agent to the Company and audit the calculation of the Commissions payable to the Agent.

(c) The Agent will remove from its property and immediately discontinue all use, directly or indirectly, of trademarks, designs, and markings owned or controlled, now or hereafter, by the Company, or of any word, title, expression, trademark, design, or marking that, in the discretion of the Company, is confusingly similar thereto. In addition, the Agent will certify in writing to the Company that the Agent has completely terminated its use of any and all such trademarks, designs, or markings, or any other word, title, or expression similar thereto that appeared in or on any devices or other materials used in conjunction with the Agent's business.

(d) Under no circumstances will the Company be liable to Agent (i) for Commissions or any other compensation to the Agent with respect to the Business or Services by or on behalf of the Company, after the termination or expiration of this Agreement, or (ii) for any damages, losses or expenses arising as a result of the Company's determination not to renew this Agreement or its termination of this Agreement in accordance with its terms, including without limitation, loss of prospective compensation, goodwill, and expenses paid or incurred in anticipation of a future business relationship with the Company.

6.4 **Disposition of Customer Relationships on Termination.** In addition to the foregoing obligations of the Agent and rights of the Company upon termination of this Agreement, the Parties agree to the following disposition of customer relationships depending on whether the Agreement is terminated 1) for cause, 2) because of retirement of the Agent's key personnel, 3) due to death or disability of the Agent's key personnel, or 4) due to Company's consent to the Agent's sale of its business.

(a) Cause. If the Company terminates this Agreement for cause under the provisions of Paragraph 6.2(b), Agent is allowed to retain, transfer, or redirect customer relationships and agrees to avoid taking any action likely to prevent current customers from doing business with Company. Agent further agrees that Company may enforce this provision by injunctive relief or otherwise if current Agents customers' info is taken for terminated Agent benefit.

(b) Retirement. In the event that the Agent desires to terminate this Agreement with the consent of the Company due to the retirement of such personnel of the Agent as would materially affect Agent's ability to provide Services, neither Agent nor any of Agent's agents, employees, representatives, independent contractors, affiliates, or successors shall be permitted to retain customer relationships. Agent agrees that, as a condition of Company's consent to termination of this Agreement due to retirement, Agent will execute a "Customer Transition Personal Services Agreement" and exercise best efforts to ensure the smooth transfer of customer relationships to Company or Company's other agents.

(c) Death and Disability. In the event that the Agent desires to terminate this Agreement with the consent of the Company due to the death or disability of such personnel of the Agent as would materially affect Agent's ability to provide Services, or if the Agent is an individual,

following the death or disability of that individual, neither Agent nor any of Agent's agents, employees, representatives, independent contractors, affiliates, or successors shall be permitted to retain customer relationships. Agent agrees that, as a condition of Company's consent to termination of this Agreement due to retirement, Agent will execute a "Customer Transition Personal Services Agreement" and exercise best efforts to ensure the smooth transfer of customer relationships to Company or Company's other agents.

(d) Sale of New Line of Business. In the event that Agent obtains Company's consent to a sale of Agent's business, or the Agent pursuing a line of business outside of the transportation and logistics industry that is not competitive with the Business or the Services, neither Agent nor any of Agent's agents, employees, representatives, independent contractors, affiliates, or successors shall be permitted to retain customer relationships. Agent agrees that, as a condition of Company's consent to termination of this Agreement due to sale, Agent will execute the Customer Transition Personal Services Agreement and exercise best efforts to ensure the smooth transfer of customer relationships to Company or Company's other agents.

ARTICLE VII
GENERAL PROVISIONS

7.1 Entire Agreement. This Agreement, including the Appendices, Exhibits and/or Schedules hereto, represents the entire Agreement between the parties on the subject matter hereof and supersedes all prior discussions, agreements, and understandings of every kind and nature between them. There are no conditions to this Agreement not expressed herein. No modification of this Agreement will be effective unless in writing and signed by both parties.

7.2 Notices. All notices under this Agreement shall be in writing and given by registered or certified mail or commercial courier service (e.g. FedEx) or facsimile, addressed to such parties at the addresses set forth below, or to such other address of which either party may advise the other in writing. Notices will be deemed given when delivered.

In case of a notice to the Company:

First Star Logistics, LLC
1762 Ridgewood Cir
Lawrenceburg IN 47025
Attn:    Todd Hammerstrom
Phone:  812-637-3251
Fax.     812-637-2508

In case of a notice to Agent:

_____
_____
_____

7.3 Force Majeure. Neither party shall be in default hereunder by reason of any failure or delay in the performance of any obligation under this Agreement where such failure or delay arises out of any cause beyond the reasonable control and without the fault or negligence of such party. Such causes shall include, without limitation, storms, floods, other acts of nature, fires, explosions, riots, terrorist acts, war or civil disturbance, strikes or other labor unrest, embargoes and other governmental actions or regulations that would prevent either party from performing its obligations under this Agreement.

7.4 Severability. The illegality or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any legal and enforceable provisions hereof.

8

7.5 Assignment. This Agreement shall be binding on and inure to the benefit of the successors and assigns of the business interests of the Company and may be assigned by the Company. The Agent shall not sell, assign, delegate, or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Company.

7.6 Applicable Law; Venue. This Agreement shall be construed, enforced, and performed in accordance with the laws of the State of Ohio, without reference to its principles of conflicts of laws. The parties hereby irrevocably and unconditionally submits to the exclusive jurisdiction of any state or federal court sitting in Hamilton County, Ohio, over any action, suit or proceeding arising out of or relating to this Agreement. The parties irrevocably and unconditionally waive any objection to the venue of any such action, suit or proceeding brought in any such court and any claim that any such action, suit or proceeding has been brought in an inconvenient forum. The Agent acknowledges and agrees that its performance under this Agreement is due and owing to the Company in Hamilton County, Ohio, and that a substantial portion of the duties and obligations of the parties are to be performed in Hamilton County, Ohio.

7.7 Waiver. Each party agrees that the failure of the other party at any time to require performance of any of the provisions this Agreement shall not operate as a waiver of the right of such other party to request strict performance of the same or like provisions, or any other provisions hereof, at a later time.

7.8 Construction. Any headings used herein are for convenience in reference only and are not a part of this Agreement, nor shall they in any way affect the interpretation hereof. It is the intention of the parties that every covenant, term, and provision of this Agreement will be construed simply according to its fair meaning and not strictly for or against any party (notwithstanding any rule of law requiring an agreement to be strictly construed against the drafting party), it being understood that the parties to this Agreement are sophisticated and have had adequate opportunity and means to retain counsel to represent their interests and to otherwise negotiate the provisions of this Agreement.

7.9 Counterparts. This Agreement or any amendment hereto may be signed in any number of counterparts, each of which will be an original, but all of which taken together will constitute one agreement or amendment, as the case may be.

[Signature page follows]

9

IN WITNESS WHEREOF, the Company and the Agent have caused this Sales Agent Agreement to be executed by their duly authorized representatives, as of the date first written above.

COMPANY:

First Star Logistics, LLC

By: _____

Todd Hammerstein

Its:    Manager

AGENT NAME:

By: _____
Signature

Raul Vicbres
Print Name

Its: _____

EXHIBIT A

Agreement Regarding
Confidentiality, Non-Solicitation and Non-Recruitment

This Agreement Regarding Confidentiality, Non-Solicitation, and Non-Recruitment (this "Agreement") is made and entered into on this 0-1-201_____ between First Star Logistics LLC, a Delaware limited liability company, its subsidiaries, affiliates, successors and assigns (collectively referred to as the "Company"), and _Nkin YCK___ and all its agents, employees, owners, officers, and representatives (the "Agent").

WHEREAS, contemporaneously with the execution and delivery of this Agreement, the Company and the Agent are entering into that certain Sales Agent Agreement dated as of the date first written above (the "Sales Agent Agreement"), and

WHEREAS, the Agent's execution and delivery of this Agreement is a condition to the Company entering into the Sales Agent Agreement.

NOW, THEREFORE, the parties hereto hereby agree as follows:

A. Confidentiality

1. Promise to Provide Confidential Information. At the inception of this Agreement, and continuing on an ongoing basis during the term of the Sales Agent Agreement, the parties agree to provide each other with new Confidential Information (defined below). This information (the "Confidential Information") includes business, proprietary, and technical information not known to others that could have economic value to others if improperly disclosed. "Confidential Information" also means any information disclosed to either party, either directly or indirectly, in writing, orally or by inspection of tangible objects, including without limitation, information and technical data contained in manuals, booklets, publications and materials and equipment of every kind and character, as well as documents, financial statements, prototypes, samples, prospects, inventions, trade secrets, product ideas, technical information, know how, processes, plans (including without limitation, marketing plans and strategies), specifications, designs, methods of operations, techniques, technology, formulas, software, improvements, financial and marketing information, forecasts, research, and the identity of any and all customers, consultants, and suppliers.

2. The Value of Confidential Information. By executing this Agreement, the parties agree that the Confidential Information constitutes valuable, special and unique assets developed by each party at great expense, the unauthorized use or disclosure of which would cause irreparable harm to the other party. The parties understand and acknowledge that each party is engaged in a highly specialized and competitive industry; that each party relies heavily on information, data, programs and processes it has developed and acquired; and that competitors can reap potential or real economic benefits from the possession of Confidential Information that is otherwise not available to them. The parties understand and acknowledge, therefore, that the protection of the Confidential Information constitutes a legitimate business interest of both parties. The parties acknowledge that the Confidential Information is the exclusive property of the providing party and is to be held by the other party and its employees and representatives in trust and solely for the providing party's benefit. The parties further acknowledge that the Confidential Information includes "trade secrets" under Ohio and any other applicable law and, in addition to the other protections provided herein, all trade secrets shall be accorded the protections and benefits under Texas and any other applicable law. Each party waives any requirement that other party submit proof of economic value of any trade secret or post a bond or other security should the need arise.

3. **Promise Not to Use or Disclose Confidential Information.** In exchange for providing party's promise to provide the receiving party with new Confidential Information, the receiving party hereby agrees that neither it nor any of its employees or representatives shall, either during the term of the Sales Agent Agreement or at any time thereafter, disclose to anyone, including, without limitation, any person, firm, corporation, or other entity, or publish, or use for any purpose, any Confidential Information, except as properly required in the ordinary course of the providing party's business or as providing party directs and authorizes. The receiving party hereby further agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information and agrees to immediately notify the providing party in the event of any unauthorized use or disclosure of the Confidential Information. The receiving party hereby further agrees that it shall be liable for its agents', employees', owners', officers', and representatives' disclosure or use of Confidential Information in violation of the provisions of this Agreement.

4. **Agreement to Return Confidential Information and Property.** Upon the termination of the Sales Agent Agreement, regardless of the reason for such termination:

(a) The parties will not take, destroy, or delete, and shall prevent its employees and representatives from taking, destroying, or deleting, any files, documents or other materials embodying or recording any Confidential Information, including copies, without obtaining in advance the written consent of an authorized representative of providing party; and

(b) The receiving party will, and will cause its employees and representatives to, promptly return to the providing party all Confidential Information, documents, files, records and tapes (written or electronically stored) that have been in its possession or control, and the receiving party will not use or disclose, and will cause its employees and representatives not to use or disclose, such materials in any way or in any format, including written information in any form, information stored by electronic means, and any and all copies of such materials. The receiving party further agrees that at the termination of the Sales Agent Agreement, regardless of the reason for such termination, or upon providing party's request, the receiving party will, and cause all its employees and representatives to, return immediately all providing party's property, including, without limitation, keys, equipment, computer(s) and computer equipment and software, access codes, devices, data, lists, information, correspondence, notes, memos, reports, or other writings.

If at any time after the termination of the Sales Agent Agreement for any reason, the receiving party determines that it or any of its employees or representatives have any Confidential Information of the providing party or property in its possession or control, the receiving party shall, and shall cause such employee or representative to, immediately return such Confidential Information or property to the providing party, including all copies and portions thereof. At the providing party's request, the receiving party agrees to execute a written certification to the providing party at the time of the termination of the Sales Agent Agreement certifying that the receiving party has complied with its obligations under this Section A.4.

5. **Legally Required Disclosure of Confidential Information.** If Confidential Information known to either party or its employees or representatives or in its or their possession is subject to a lawful production order by any judicial, regulatory, administrative, legislative, or governmental authority, or any other person or entity, the receiving party agrees to notify the providing party promptly that such lawful order has been received. If the receiving party or any of its employees or representatives is required to disclose the Confidential Information pursuant to such lawful order, then the receiving party agrees to use its commercially reasonable efforts to obtain assurances that the Confidential Information will be maintained on a confidential basis and not be disclosed to a greater degree than legally required.

8

6. **The Company's Right to Inspect.** The Agent agrees that, to ensure compliance with the terms of this Agreement, the Company shall have the right to retain, access, and inspect all property of the Agent of any kind at termination of the Sales Agent Agreement and at any time during the term of the Sales Agent Agreement.

7. **This section intentionally omitted.**

8. **Third Party Information.** The parties recognize that each party has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on either party's part to maintain the confidentiality of such information and to use it only for certain limited purposes. The parties agree to hold, and to cause its employees and representatives to hold, all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary to sell, market, and perform the services and consistent with either party's agreement with such third party.

B. <u>Non-Solicitation and Non-Recruitment</u>

The Agent agrees that to protect the Confidential Information, it is necessary to enter into the following restrictive covenants, which are ancillary to the enforceable promises between the Company and the Agent in <u>Section A</u> of this Agreement.

1. **Non-Solicitation.** The Agent agrees that during the term of the Sales Agent Agreement, and for a period of 365 days following the termination of Sales Agent Agreement for any reason, the Agent (including its owners, employees, officers, directors, and representatives) will not, directly or indirectly, either individually or as a principal, partner, agent, consultant, contractor, employee, or as a director or officer of any corporation or association, or in any other manner or capacity whatsoever, except on behalf of the Company, solicit business, or attempt to solicit business, in products or services competitive with products or services sold by the Company, from (a) any customer or client of the Company, or (b) any prospective customer or client with whom the Agent dealt or solicited during the shorter of (i) the period between the commencement of the Sales Agent Agreement and the termination of the Sales Agent Agreement in accordance with its terms and (ii) the 12-month period immediately preceding the termination of the Sales Agent Agreement for any reason. Subject to the terms and conditions of the Sales Agent Agreement, this Non-Solicitation provision will not apply to those customers listed on Schedule B.

2. **Non-Recruitment.** The Agent agrees that during the term of the Sales Agent Agreement, and for a period of one year following the date of the termination of the Sales Agent Agreement for any reason, the Agent agrees that it will not, directly or indirectly, hire, solicit, induce, recruit, engage, go into business with, encourage to leave their employment with the Company or terminate their sales agent agreement with the Company, or otherwise contract for services with, any employee or agent of the Company, or any former employee or agent of the Company whose employment with the Company ceased or whose sales agent agreement with the Company terminated less than six months earlier.

3. **Nature of the Restrictions.** The Agent agrees that the time, geographical area, and scope of restrained activities for the restrictions in <u>Section B.1</u> of this Agreement are reasonable, especially in light of the Company's desire to protect its Confidential Information, and that the restrictions in <u>Section B.1</u> of this Agreement will not preclude the Agent or its owners from gainful employment in the event of the termination of the Sales Agent Agreement for any reason. If a court concludes that any time period, geographical area, or scope of restrained activities specified in <u>Section B.1</u> of this Agreement is unenforceable, the court is vested with the authority to reduce the time period, geographical area, and/or scope of restrained activities, so that the restrictions may be enforced to the fullest extent permitted by law. Additionally, if the Agent or its owners violate any of the restrictions contained in <u>Section B.1</u> of this Agreement, the restrictive period shall be suspended and will not run in favor of the Agent from the

3

10. **Excluded Accounts.** The Company and the Agent have agreed that certain accounts of the Agent are excluded from the operation of certain provisions of this Agreement and the Sales Agent Agreement as further detailed in Schedule B to the Sales Agent Agreement

11. **Entire Agreement and Amendment.** This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior discussions between the parties with respect to the subject matter of this Agreement  This Agreement may not be amended, nor any obligation waived, except by a writing signed by both parties hereto.

IN WITNESS WHEREOF, the undersigned have executed Exhibit A of the Sales Agent Agreement as of the date first above written

COMPANY:

First Star Logistics LLC

By:  _____

Todd Hammerstrom

Its:  Manager

AGENT NAME:

By:  _____

Signature

Rana Victoros

Print Name

Its:  _____

SCHEDULE A

6

Sales Commission

The following sales Commission, as defined and calculated in this Agreement, will be ____% for the term of this Agreement unless otherwise determined by the terms of this Agreement.

_____ Initials – FSL

_____ Initials – Agent

8

Form **W-9**
(Rev. January 2011)
Department of the Treasury
Internal Revenue Service

## Request for Taxpayer
## Identification Number and Certification

Give Form to the
requester. Do not
send to the IRS.

Name (as shown on your income tax return)

Karl Victory

Business name/disregarded entity name, if different from above

Coast 2 Coast Business Brokers, LLC

Check appropriate box for federal tax classification:

☐ Individual/sole proprietor  ☐ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate

☑ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

☐ Other (see instructions) ▶

☐ Exempt payee

Address (number, street, and apt. or suite no.)

374 Nebraska St.

City, state, and ZIP code

Bellwood FL 33019

Requester's name and address (optional)

List account number(s) here (optional)

### Part I  Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Note. If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

2 0 1 - 8 2 - 4 8 4

Employer identification number

### Part II  Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 4.

Sign Here

Signature of U.S. person ▶ *Karl Victory*   Date ▶ 8-12-2013

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

### Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

Note. If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

Definition of a U.S. person. For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

Special rules for partnerships. Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

Cat. No. 10231X   Form **W-9** (Rev. 1-2011)

# APPENDIX B

<u>SALES AGENT AGREEMENT</u>

THIS SALES AGENT AGREEMENT (this "<u>Agreement</u>") is made as of _May 8th_, 20_17_ by and between First Star Logistics LLC, a Delaware limited liability company, or any successor in interest thereto (the "<u>Company</u>") and _Bullhead hauler M_ whose address is _40767 Morgan R Billing MT 59101_, (the "<u>Agent</u>"). The Company and the Agent are each a "party" and together are "parties" to this Agreement.

## RECITALS

A. The Company is a third-party logistics business that provides and manages motor carrier brokerage services, intermodal marketing services, international air and ocean services, freight forwarding services, warehousing, supply chain management services, and a broad range of other transportation services, including without limitation the leasing, allocation and interchange of intermodal equipment (the "<u>Business</u>"); and

B. The Company desires to engage Agent to sell the products and services included in the Business to customers and provide other services in furtherance of the Business in accordance with the terms of this Agreement.

C. The Agent desires to actively and diligently promote the Business and sell such products and services and provide such other services, all in accordance with the terms of this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and the mutual benefits to be derived hereunder, the parties, intending to be legally bound, hereby covenant and agree as follows:

### ARTICLE 1
### APPOINTMENT AND SCOPE

1.1 <u>Appointment</u>. Subject to the terms and conditions and for the term of this Agreement, the Company hereby appoints the Agent as a non-exclusive independent agent to market, sell, and provide Services (as defined below) and to provide certain services in furtherance of the Business as set forth in this Agreement. The Agent hereby accepts such appointment upon the terms and subject to the conditions set forth in this Agreement and agrees that it will use its best commercially-reasonable efforts to advance and expand the Business of Company. For purposes of this Agreement, "<u>Services</u>" means transportation management and/or supply chain management, arranging and contracting for freight, transportation, and warehousing services, freight routing, logistics services and consulting, fleet management, scheduling and tracing services, leasing of intermodal equipment, customer and customer support services and other services in furtherance of the Business as the Company may request for its benefit. Agent further acknowledges and agrees that it will not take actions, or fail to act, in a way likely to result in harm to Company's Business including, without limitation, directing business away from Company.

1.2 <u>Independent Contractor Status</u>.

(a) This Agreement does not constitute an association, general agency, partnership or joint venture. Except for the solicitation of orders and the provision of Services in accordance with the provisions hereof, the Agent shall not be considered an agent or legal representative of the Company for any purpose. Except as expressly provided herein, the Agent is not granted and shall not exercise the right or authority to assume or create any obligation or responsibility, including, without limitation, contractual obligations and obligations based on warranties or

authority to any third party and shall avoid giving the appearance of having authority to bind the Company other than as provided in and consistent with this Agreement.

(b)     Neither the Agent nor any agent, employee, or representative of the Agent shall be, or shall be considered, an employee of the Company. The Agent's relationship with the Company shall be that of an independent contractor, and as such, except as expressly set forth in this Agreement, the Company shall not have control, and the Agent shall have exclusive control, over when, where, and how the Agent sells, markets, or provides the Services or performs its other obligations under this Agreement.

## ARTICLE II
## AGENT REPRESENTATIONS

Agent hereby represents and warrants to the Company as follows:

II.1     Authority and Enforceability.  Agent is duly authorized to enter into this Agreement, and this Agreement is valid, binding and enforceable against Agent in accordance with its terms.

II.2     Consents; Conflicts.

(a)     Agent has obtained all governmental and third party consents and approvals required for Agent to enter into this Agreement and perform in accordance with its terms and to sell, market, and perform the Services.

(b)     Agent is not bound by the terms of any agreement with any previous employer or other party to refrain from (i) using or disclosing any trade secret or confidential or proprietary information in the course of marketing, selling, or performing Services or performing its other obligations under this Agreement or (ii) competing, directly or indirectly, with the business of such previous employer or any other party. This Agreement and Agent's sales, marketing, and performance of Services and performance of its other obligations under this Agreement do not, and will not, breach any agreement to keep in confidence proprietary information, knowledge or data acquired by Agent in confidence or in trust before the Company's engagement of Agent. Agent will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employer or any other party.

II.3     No Inducement to Breach Contracts with Others.  The Company has not encouraged or induced Agent to breach or violate the terms of any contract or agreement, whether oral or written, to which Agent is a party or otherwise bound or subject.

II.4     Permits; Compliance with Laws.

(a)     Agent possesses, and will maintain during the term of this Agreement, all required licenses, approvals, consents, permits, and certifications necessary for Agent's performance of its obligations under the terms of this Agreement.

(b)     Agent is not in violation of any applicable law, rule, regulation, or ordinance, whether federal, state, or local. Agent will not violate any applicable law, rule, regulation, or ordinance, whether federal, state or local during performance of its obligations under the terms of this Agreement.

## ARTICLE III
## AGENT RIGHTS, OBLIGATIONS AND COVENANTS

III.1     Operations and Expenses.

(a)     *Agent's Control.*  The detailed operations of the Agent are subject to its sole control and management.

(b)     *Agent's Liability for Expenses.*  Except as expressly provided in this Agreement, the Agent shall be responsible and liable for its costs and expenses of selling, marketing, and

2



providing the Services and performing its other obligations under this Agreement, including without limitation salaries and benefits of the Agent's employees and representatives, travel, administrative, entertainment, all other operating expenses (including any required license and permitting fees) and all applicable federal, state and local taxes. The Company shall provide, at the Company's expense business forms and advertising materials bearing the Company's name and logo for the Agent's use in selling, marketing, and providing Services and performing its other obligations under the terms of this Agreement.

(c)     *No Authority to Incur Expenses on Behalf of the Company.* Except to the extent expressly provided in this Agreement, the Agent shall not enter into any contract or agreement by or on behalf of the Company or extend credit or agree upon payment terms on behalf of the Company.

(d)     *Diligence; Customer Liaison.* The Agent agrees that it will use its diligent best efforts to market, sell, and provide Services and to act as liaison between the Company and customers.

(e)     *Agent's Office; Hiring and Training Personnel.* The Agent will provide, at its own expense, such office space and facilities, and hire and train such personnel, as the Agent determines in its discretion may be required to carry out its obligations under this Agreement.

(f)     *Promotional Materials.* The Agent will not use any advertising or promotional materials to market, promote, or provide Services that have not been provided by the Company (at the Company's expense), unless the Agent has first obtained from the Company its prior written approval of such materials.

(g)     *Agent's Authority.* This Agreement shall not constitute a general grant of authority to the Agent to bind the Company.     The Agent may negotiate rates with the Company's list of approved vendors and carriers ("Approved Vendors"). In connection with the performance of its obligations under this Agreement, the Agent shall not engage any transportation or freight services from any vendor or carrier other than an Approved Vendor. All invoices from Approved Vendors shall be sent directly to the Company, and subject to the other terms of this Agreement, the Company shall pay such invoices directly to the Approved Vendors.

(h)     *Group Medical Insurance.* If available and if permitted by the Company's group medical insurance plan, the Agent's employees shall have the option to participate in any group medical insurance plan that the Company provides for or makes available to employees of the Company's agents; provided, however, that the Agent shall be liable for the payment of premiums with respect to its covered employees.

(i)     *Agent's Insurance Coverage.* The Agent will obtain and maintain insurance policies with reputable insurers that provide such coverage for its operations that is customary and prudent in its industry, including, without limitation, public liability insurance and, to the extent required by applicable law, workers' compensation insurance for its employees, and will cause the Company to be added to such policies as an additional loss payee. Upon the Company's request, the Agent will provide copies of all its policies and certificates of current coverage to the Company.

(j)     *Compliance with Laws.* Agent will comply with all applicable federal, state, and local laws, rules, regulations and ordinances in connection with marketing, selling, or providing Services and its other obligations under the terms of this Agreement.

(k)     *No Questionable Payments.* The Agent will not, directly or indirectly, in the name of, on behalf of, or for the benefit of the Company offer, promise, or authorize to pay, or pay any compensation, or give anything of value to, (i) any official, agent, or employee of any government or governmental agency, (ii) any political party or officer, employee, or agent thereof, (iii) any candidate for political office, or (iv) any officer or employee of any customer, to

3



the extent such compensation or payment to the customer's officer or employee violates any applicable law or corporate policy of such customer.

III.2 Customer Accounts.

(a)    Before selling or providing Services to any prospective customer, the Agent must comply with the Company's policies and procedures on account clearance, credit limits and payment terms. Agent further agrees not to sell or provide Services to any customer to the extent its outstanding receivables are outside the approved terms or credit limits or to the extent such Services would result in an accounts receivable balance in excess of the approved credit limits for such customer.

(b)    The Agent will be primarily responsible for finalizing shipments for the customers for Services and shall use its best efforts to invoice 48 hours after the delivered date of the shipment of the customer's goods or the performance of other Services, as the case may be.

(c)    The Agent will have no authority to request or accept payment for Services from customers on behalf of the Company.

(d)    The Agent will be liable to the Company for any accounts receivables balances booked in violation of the provisions of Section 3.2(a) and for any accounts receivables that are uncollected as a result of the Agent's negligence, breach of this Agreement, or failure to adhere to the Company's policies and procedures. The Company may, in its discretion, collect any or all of any liability of the Agent under the preceding sentence (the "Excess Bad Debt") by offsetting such amounts against Commissions to which the Agent is entitled in accordance with ARTICLE IV of this Agreement. To the extent a customer or the Agent has not paid the Company an Excess Bad Debt before the earlier of (i) 12 months from the date of the uncollected invoice and (ii) the termination of this Agreement for any reason, then the Agent will pay the Company the amount of the uncollected Excess Bad Debt, plus interest at the rate of the lesser of (A) 1.5% per month and (B) the highest applicable legal rate from the invoice date until such Excess Bad Debt is paid in full to the Company. For purposes of this Section 3.2(d), customer payments shall be applied against referenced invoices, and if the customer does not reference an invoice with its payment, then against the oldest outstanding invoices first.

(f) Agent will be liable to refund to the Company for any and all Commissions paid to Agent on Services for which the Company does not ultimately collect.

III.3 Agreement Regarding Confidentiality, Non-Solicitation, Non-Recruitment and Non-Competition. Contemporaneously with the execution and delivery of this Agreement, the Agent shall execute and deliver to the Company the Agreement Regarding Confidentiality, Non-Solicitation, and Non-Recruitment, attached as Exhibit A to this Agreement.

III.4 Policies and Procedures. The Agent hereby agrees to comply with, and to cause its employees and representatives to comply with the Company's Policy and Procedure Manual. Said manual is provided and it is the Agent's responsibility to be aware of, and keep current with the policies and procedures contained therein. The Company may audit the Agent's business and practices at any time for purposes of ensuring the Agent's compliance with the Company's policies and procedures. The Agent agrees to provide the Company with access to the Agent's books and records during normal business hours for purposes of conducting such audit.

ARTICLE IV
COMPENSATION

IV.1 Compensation. Subject to the provisions of this ARTICLE IV and the Agent's performance of its obligations under this Agreement, the Company will pay the Agent a commission ("Commissions") equal to a percentage of the Net Revenue (as defined below) as specified on Schedule A hereto for Services sold by the Agent to customers pursuant to orders procured by the Agent in accordance with this Agreement. The Agent will not be entitled to any Commissions from sales in

4

violation of Section 3.2(a) or with respect to invoiced amounts that the Agent instructs the Company to "write off." The term "Net Revenue" means (a) the amount of each customer invoice for Services procured by the Agent in accordance with this Agreement less (b) all transportation related charges, including, without limitation, truck transportation, rail and shipping freight charges, and drayage charges, in each case, without regard to early payment discounts or volume incentives or discounts.

    IV.2   Manner of Payment. Payment of all Commissions shall be made, at the Company's election, (a) by bank check payable to the Agent and mailed to the Agent's address reflected in the Company's records, or (b) by wire transfer to a national or state bank in the United States designated in writing by the Agent for credit directly to an account in the name of the Agent.

    IV.3   Time of Payment. The Commissions shall be payable weekly based on invoices to customers from the immediately preceding week.

    IV.4   Split Commissions. In cases in which an order is or is claimed to have been solicited by more than one agent of the Company, including the Agent, the Company may pay a split Commission to the agents involved. In no event will the Company be required to pay more than the amount of one full Commission applicable to any customer invoice.

    IV.5   Offsets. All Commissions, compensation or other amounts payable hereunder by the Company to the Agent will be subject to offset for any claims or other amounts owed by the Agent to the Company pursuant to the provisions hereof or otherwise.

    IV.6   Chargebacks. The Company shall have the right to chargeback the Agent's Commission account the amount of any refund or credit to the account of any customer based on the customer's claim that no order for Services was submitted or for any other reason presented by customer. The Company shall, in its sole discretion, but after consultation with the Agent, determine if the refund or credit is to be made in response to a customer complaint. If the Agent has no Commissions to chargeback against, then the Agent will promptly pay to the Company the amount of any Commission it received with respect to any such refunded or credited amount.

ARTICLE V
INDEMNIFICATION

   V.1   Indemnification.

       (a)    The Agent agrees to indemnify and hold the Company, its officers, directors, employees, successors, and assigns harmless against all losses, damages, or expenses of whatever form or nature, including attorneys' fees and other costs of legal defense, whether direct or indirect, that they, or any of them, sustains or incurs as a result of the Agent or any of its employees or agents (i) breaching any provision of this Agreement, (ii) making representations or statements not specifically authorized by the Company herein or otherwise in writing, (iii) marketing, selling, or providing Services to customers other than as expressly authorized in this Agreement, (iv) violating any applicable law, rule, regulation, ordinance or order, or (v) negligent acts or omissions.

       (b)    The Company agrees to indemnify and hold the Agent harmless against all losses, damages, or expenses of whatever form or nature, including attorneys' fees and other costs of legal defense, whether direct or indirect, that it sustains or incurs as a result of any acts or omissions of the Company or any of its employees or agents, including but not limited to (i) breaching any provision of this Agreement, or (ii) violating any applicable law, rule, regulation, ordinance or order.

ARTICLE VI
TERM AND TERMINATION

5

VI.1   Term  Unless terminated as provided in Section 6.2 below, this Agreement will continue in full force and effect for an initial term of five years commencing on the effective date hereof. Thereafter, this Agreement will be automatically renewed for subsequent one-year terms unless written notice of termination of this Agreement is given by a party to the other party at least 120 days in advance of the termination of the initial term or any renewal term, as the case may be.

VI.2   Termination.  This Agreement may be terminated prior to expiration of the initial or any renewal term, as provided in Section 6.1, by written notice to the other party as follows:

     (a)    By the mutual written consent of the Company and the Agent; provided, however, that if the Agent requests the Company's mutual consent to a termination of this Agreement as a result of (i) the death or disability of the Agent or a material employee of the Agent, (ii) the Agent's or its material employee's determination to retire, or (iii) the sale of the Agent's business, or (iv) the Agent's determination to pursue a line of business outside the transportation or logistics industry that is not competitive with the Business or the Services, then the Company will not unreasonably withhold its consent to such termination, provided the Agent diligently assists the Company in transitioning all its customers for Services and other Business related activities to another agent of the Company; or

     (b)    By the Company, at any time after the occurrence or existence of the following conditions, each of which shall constitute grounds for termination for "Cause" as that term is used in Paragraph 6.4(a):

        (i)    the Agent's breach of any of its representations or covenants in this Agreement, if the Agent fails to cure such breach within 15 days after receiving a written notice thereof from the Company; provided, however, that the Company will only be required to provide notice and an opportunity to cure two non-similar breaches in any 12-month period;

        (ii)    the Agent becomes insolvent or the subject of any voluntary or involuntary bankruptcy, receivership, or other insolvency proceeding or make an assignment or other arrangement for the benefit of its creditors;

        (iii)    if, in the good faith discretion of the Company, the Agent engages in conduct that is detrimental or harmful to the Business, there is a significant change in the ownership or management of the Agent, or the Agent's financial condition is such that it cannot adequately market or provide Services or comply with the Company's policies and procedures;

        (iv)    an attempt by the Agent to sell, assign, delegate or transfer any of its rights and obligations under this Agreement without having obtained the Company's prior written consent thereto;

        (v)    the Company obtains knowledge that the Agent's representation in Section 2.2(b) is false in any material respect; or

        (vi)    the Agent breaches or otherwise fails to perform its obligations under the Non-Competition Agreement; or

     (c)    By the Agent, effective immediately if the Company fails to pay the Agent the Commissions when due and if the Company fails to make such payment within 15 days after receiving written notice thereof from the Agent; provided, however, that the Agent will only be required to provide notice and an opportunity to cure such failure to pay twice in any 12-month period.

VI.3   Rights of Parties on Termination.  In addition to the other applicable provisions of this Agreement and the Agreement Regarding Confidentiality, Non-Solicitation, and Non-Recruitment, the following provisions apply upon the termination or expiration of this Agreement:

6



(a)     The Agent will immediately cease soliciting orders for, and providing, Services.

(b)     All indebtedness of the Agent to the Company shall become immediately due and payable without further notice or demand, which is hereby expressly waived, and the Company shall be entitled to reimbursement for any reasonable attorneys' fees that it may incur in collecting or enforcing payment of such obligations. Notwithstanding anything to the contrary in this Agreement, following the termination of this Agreement for any reason, the Company will be entitled to withhold payment of Commissions to the Agent until it is able to determine the amount of the liability, if any, of the Agent to the Company and audit the calculation of the Commissions payable to the Agent.

(c)     The Agent will remove from its property and immediately discontinue all use, directly or indirectly, of trademarks, designs, and markings owned or controlled, now or hereafter, by the Company, or of any word, title, expression, trademark, design, or marking that, in the discretion of the Company, is confusingly similar thereto. In addition, the Agent will certify in writing to the Company that the Agent has completely terminated its use of any and all such trademarks, designs, or markings, or any other word, title, or expression similar thereto that appeared in or on any devices or other materials used in conjunction with the Agent's business.

(d)     Under no circumstances will the Company be liable to Agent (i) for Commissions or any other compensation to the Agent with respect to the Business, or Services by or on behalf of the Company, after the termination or expiration of this Agreement, or (ii) for any damages, losses or expenses arising as a result of the Company's determination not to renew this Agreement or its termination of this Agreement in accordance with its terms, including, without limitation, loss of prospective compensation, goodwill, and expenses paid or incurred in anticipation of a future business relationship with the Company.

VI.4  Disposition of Customer Relationships on Termination.  In addition to the foregoing obligations of the Agent and rights of the Company upon termination of this Agreement, the Parties agree to the following disposition of customer relationships depending on whether the Agreement is terminated 1) for cause, 2) because of retirement of the Agent's key personnel, 3) due to death or disability of the Agent's key personnel, or 4) due to Company's consent to the Agent's sale of its business.

(a)     Cause.  If the Company terminates this Agreement for cause under the provisions of Paragraph 6.2(b), Agent is allowed to retain, transfer, or redirect customer relationships and agrees to avoid taking any action likely to prevent current customers from doing business with Company. Agent further agrees that Company may enforce this provision by injunctive relief or otherwise if current Agents customers' info is taken for terminated Agent benefit.

(b) Retirement. In the event that the Agent desires to terminate this Agreement with the consent of the Company due to the retirement of such personnel of the Agent as would materially affect Agent's ability to provide Services, neither Agent nor any of Agent's agents, employees, representatives, independent contractors, affiliates, or successors shall be permitted to retain customer relationships. Agent agrees that, as a condition of Company's consent to termination of this Agreement due to retirement, Agent will execute a "Customer Transition Personal Services Agreement" and exercise best efforts to ensure the smooth transfer of customer relationships to Company or Company's other agents.

(c) Death and Disability. In the event that the Agent desires to terminate this Agreement with the consent of the Company due to the death or disability of such personnel of the Agent as would materially affect Agent's ability to provide Services, or if the Agent is an individual, following the death or disability of that individual, neither Agent nor any of Agent's agents, employees, representatives, independent contractors, affiliates, or successors shall be permitted to retain customer relationships. Agent agrees that, as a condition of Company's consent to termination of this Agreement due to retirement, Agent will execute a "Customer Transition

7



Personal Services Agreement" and exercise best efforts to ensure the smooth transfer of customer relationships to Company or Company's other agents.

(d) Sale of New Line of Business. In the event that Agent obtains Company's consent to a sale of Agent's business, or the Agent pursuing a line of business outside of the transportation and logistics industry that is not competitive with the Business or the Services, neither Agent nor any of Agent's agents, employees, representatives, independent contractors, affiliates, or successors shall be permitted to retain customer relationships. Agent agrees that, as a condition of Company's consent to termination of this Agreement due to sale, Agent will execute the Customer Transition Personal Services Agreement and exercise best efforts to ensure the smooth transfer of customer relationships to Company or Company's other agents.

## ARTICLE VII
## GENERAL PROVISIONS

VII.1 Entire Agreement. This Agreement, including the Appendices, Exhibits and/or Schedules hereto, represents the entire Agreement between the parties on the subject matter hereof and supersedes all prior discussions, agreements, and understandings of every kind and nature between them. There are no conditions to this Agreement not expressed herein. No modification of this Agreement will be effective unless in writing and signed by both parties.

VII.2 Notices. All notices under this Agreement shall be in writing and given by registered or certified mail or commercial courier service (e.g. FedEx) or facsimile, addressed to such parties at the addresses set forth below, or to such other address of which either party may advise the other in writing. Notices will be deemed given when delivered.

In case of a notice to the Company:

First Star Logistics, LLC
1762 Ridgewood Cir.
Lawrenceburg IN 47025
Attn:   Todd Hammerstrom
Phone:  812-637-3251
Fax:    812-637-2508

In case of a notice to Agent:

_____

_____

_____

VII.3 Force Majeure. Neither party shall be in default hereunder by reason of any failure or delay in the performance of any obligation under this Agreement where such failure or delay arises out of any cause beyond the reasonable control and without the fault or negligence of such party. Such causes shall include, without limitation, storms, floods, other acts of nature, fires, explosions, riots, terrorists acts, war or civil disturbance, strikes or other labor unrest, embargoes and other governmental actions or regulations that would prevent either party from performing its obligations under this Agreement.

VII.4 Severability. The illegality or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any legal and enforceable provisions hereof.

VII.5 Assignment. This Agreement shall be binding on and inure to the benefit of the successors and assigns of the business interests of the Company and may be assigned by the Company. The Agent shall not sell, assign, delegate, or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Company.

8



VII.6 Applicable Law; Venue. This Agreement shall be construed, enforced, and performed in accordance with the laws of the State of Ohio, without reference to its principles of conflicts of laws. The parties hereby irrevocably and unconditionally submits to the exclusive jurisdiction of any state or federal court sitting in Hamilton County, Ohio, over any action, suit or proceeding arising out of or relating to this Agreement. The parties irrevocably and unconditionally waive any objection to the venue of any such action, suit or proceeding brought in any such court and any claim that any such action, suit or proceeding has been brought in an inconvenient forum. The Agent acknowledges and agrees that its performance under this Agreement is due and owing to the Company in Hamilton County, Ohio, and that a substantial portion of the duties and obligations of the parties are to be performed in Hamilton County, Ohio.

VII.7 Waiver. Each party agrees that the failure of the other party at any time to require performance of any of the provisions this Agreement shall not operate as a waiver of the right of such other party to request strict performance of the same or like provisions, or any other provisions hereof, at a later time.

VII.8 Construction. Any headings used herein are for convenience in reference only and are not a part of this Agreement, nor shall they in any way affect the interpretation hereof. It is the intention of the parties that every covenant, term, and provision of this Agreement will be construed simply according to its fair meaning and not strictly for or against any party (notwithstanding any rule of law requiring an agreement to be strictly construed against the drafting party), it being understood that the parties to this Agreement are sophisticated and have had adequate opportunity and means to retain counsel to represent their interests and to otherwise negotiate the provisions of this Agreement.

VII.9 Counterparts. This Agreement or any amendment hereto may be signed in any number of counterparts, each of which will be an original, but all of which taken together will constitute one agreement or amendment, as the case may be.

[Signature page follows]

Nhv

9

IN WITNESS WHEREOF, the Company and the Agent have caused this Sales Agent Agreement to be executed by their duly authorized representatives, as of the date first written above.

COMPANY:

First Star Logistics, LLC

By: _____

     Todd Hammerstrom

Its:    Manager

AGENT NAME:

By: _____
Signature

Raul Victores
Print Name

Its: _____

10

EXHIBIT A

Agreement Regarding
Confidentiality, Non-Solicitation, Non-Recruitment,
And Non-Competition

This Agreement Regarding Confidentiality, Non-Solicitation, and Non-Recruitment (this "Agreement") is made and entered into on this _May 9th 201_ between First Star Logistics LLC, a Delaware limited liability company, its subsidiaries, affiliates, successors and assigns (collectively referred to as the "Company"), and _Guthrie Logistics_ and all its agents, employees, owners, officers, and representatives (the "Agent").

WHEREAS, contemporaneously with the execution and delivery of this Agreement, the Company and the Agent are entering into that certain Sales Agent Agreement dated as of the date first written above (the "Sales Agent Agreement"); and

WHEREAS, the Agent's execution and delivery of this Agreement is a condition to the Company entering into the Sales Agent Agreement.

NOW, THEREFORE, the parties hereto hereby agree as follows:

A.   Confidentiality

   1.   Promise to Provide Confidential Information. At the inception of this Agreement, and continuing on an ongoing basis during the term of the Sales Agent Agreement, the parties agree to provide each other with new Confidential Information (defined below). This information (the "Confidential Information") includes business, proprietary, and technical information not known to others that could have economic value to others if improperly disclosed. "Confidential Information" also means any information disclosed to either party, either directly or indirectly, in writing, orally or by inspection of tangible objects, including without limitation, information and technical data contained in manuals, booklets, publications and materials and equipment of every kind and character, as well as documents, financial statements, prototypes, samples, prospects, inventions, trade secrets, product ideas, technical information, knowhow, processes, plans (including without limitation, marketing plans and strategies), specifications, designs, methods of operations, techniques, technology, formulas, software, improvements, financial and marketing information, forecasts, research, and the identity of any and all customers, consultants, and suppliers.

   2.   The Value of Confidential Information. By executing this Agreement, the parties agree that the Confidential Information constitutes valuable, special and unique assets developed by each party at great expense, the unauthorized use or disclosure of which would cause irreparable harm to the other party. The parties understand and acknowledge that each party is engaged in a highly specialized and competitive industry; that each party relies heavily on information, data, programs and processes it has developed and acquired; and that competitors can reap potential or real economic benefits from the possession of Confidential Information that is otherwise not available to them. The parties understand and acknowledge, therefore, that the protection of the Confidential Information constitutes a legitimate business interest of both parties. The parties acknowledge that the Confidential Information is the exclusive property of the providing party and is to be held by the other party and its employees and representatives in trust and solely for the providing party's benefit. The parties further acknowledge that the Confidential Information includes "trade secrets" under Ohio and any other applicable law and, in addition to the other protections provided herein, all trade secrets shall be accorded the protections and benefits under Texas and any other applicable law. Each party waives any

11



requirement that other party submit proof of economic value of any trade secret or post a bond or other security should the need arise.

       **3.**    **Promise Not to Use or Disclose Confidential Information.**  In exchange for providing party's promise to provide the receiving party with new Confidential Information, the receiving party hereby agrees that neither it nor any of its employees or representatives shall, either during the term of the Sales Agent Agreement or at any time thereafter, disclose to anyone, including, without limitation, any person, firm, corporation, or other entity, or publish, or use for any purpose, any Confidential Information, except as properly required in the ordinary course of the providing party's business or as providing party directs and authorizes.  The receiving party hereby further agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information and agrees to immediately notify the providing party in the event of any unauthorized use or disclosure of the Confidential Information.  The receiving party hereby further agrees that it shall be liable for its agents', employees', owners', officers', and representatives' disclosure or use of Confidential Information in violation of the provisions of this Agreement.

       **4.**    **Agreement to Return Confidential Information and Property.**  Upon the termination of the Sales Agent Agreement, regardless of the reason for such termination:

       (a)    The parties will not take, destroy, or delete, and shall prevent its employees and representatives from taking, destroying, or deleting, any files, documents or other materials embodying or recording any Confidential Information, including copies, without obtaining in advance the written consent of an authorized representative of providing party; and

       (b)    The receiving party will, and will cause its employees and representatives to, promptly return to the providing party all Confidential Information, documents, files, records and tapes (written or electronically stored) that have been in its possession or control, and the receiving party will not use or disclose, and will cause its employees and representatives not to use or disclose, such materials in any way or in any format, including written information in any form, information stored by electronic means, and any and all copies of such materials.  The receiving party further agrees that at the termination of the Sales Agent Agreement, regardless of the reason for such termination, or upon providing party's request, the receiving party will, and cause all its employees and representatives to, return immediately all providing party's property, including, without limitation, keys, equipment, computer(s) and computer equipment and software, access codes, devices, data, lists, information, correspondence, notes, memos, reports, or other writings.

       If at any time after the termination of the Sales Agent Agreement for any reason, the receiving party determines that it or any of its employees or representatives have any Confidential Information of the providing party or property in its possession or control, the receiving party shall, and shall cause such employee or representative to, immediately return such Confidential Information or property to the providing party, including all copies and portions thereof.  At the providing party's request, the receiving party agrees to execute a written certification to the providing party at the time of the termination of the Sales Agent Agreement certifying that the receiving party has complied with its obligations under this Section A.4.

       **5.**    **Legally Required Disclosure of Confidential Information.**  If Confidential Information known to either party or its employees or representatives or in its or their possession is subject to a lawful production order by any judicial, regulatory, administrative, legislative, or governmental authority, or any other person or entity, the receiving party  agrees to notify the providing party promptly that such lawful order has been received.  If the receiving party or any of its employees or representatives is required to disclose the Confidential Information pursuant to such lawful order, then the receiving party agrees to use its commercially reasonable efforts to obtain assurances that the



12

Confidential Information will be maintained on a confidential basis and not be disclosed to a greater degree than legally required.

6. **The Company's Right to Inspect.** The Agent agrees that, to ensure compliance with the terms of this Agreement, the Company shall have the right to retain, access, and inspect all property of the Agent of any kind at termination of the Sales Agent Agreement and at any time during the term of the Sales Agent Agreement.

7. **This section intentionally omitted.**

8. **Third Party Information.** The parties recognize that each party has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on either party's part to maintain the confidentiality of such information and to use it only for certain limited purposes. The parties agree to hold, and to cause its employees and representatives to hold, all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary to sell, market, and perform the services and consistent with either party's agreement with such third party.

**B.    Non-Solicitation and Non-Recruitment**

The Agent agrees that to protect the Confidential Information, it is necessary to enter into the following restrictive covenants, which are ancillary to the enforceable promises between the Company and the Agent in Section A of this Agreement.

1. **Non-Solicitation.** The Agent agrees that during the term of the Sales Agent Agreement, and for a period of 365 days following the termination of Sales Agent Agreement for any reason, the Agent (including its owners, employees, officers, directors, and representatives) will not, directly or indirectly, either individually or as a principal, partner, agent, consultant, contractor, employee, or as a director or officer of any corporation or association, or in any other manner or capacity whatsoever, except on behalf of the Company, solicit business, or attempt to solicit business, in products or services competitive with products or services sold by the Company, from (a) any customer or client of the Company, or (b) any prospective customer or client with whom the Agent dealt or solicited during the shorter of (i) the period between the commencement of the Sales Agent Agreement and the termination of the Sales Agent Agreement in accordance with its terms and (ii) the 12-month period immediately preceding the termination of the Sales Agent Agreement for any reason. Subject to the terms and conditions of the Sales Agent Agreement, this Non-Solicitation provision will not apply to those customers listed on Schedule B.

2. **Non-Recruitment.** The Agent agrees that during the term of the Sales Agent Agreement, and for a period of one year following the date of the termination of the Sales Agent Agreement for any reason, the Agent agrees that it will not, directly or indirectly, hire, solicit, induce, recruit, engage, go into business with, encourage to leave their employment with the Company or terminate their sales agent agreement with the Company, or otherwise contract for services with, any employee or agent of the Company, or any former employee or agent of the Company whose employment with the Company ceased or whose sales agent agreement with the Company terminated less than six months earlier.

3. **Nature of the Restrictions.** The Agent agrees that the time, geographical area, and scope of restrained activities for the restrictions in Section B.1 of this Agreement are reasonable, especially in light of the Company's desire to protect its Confidential Information, and that the restrictions in Section B.1 of this Agreement will not preclude the Agent or its owners from gainful employment in the event of the termination of the Sales Agent Agreement for any reason. If a court concludes that any time period, geographical area, or scope of restrained activities specified in Section

13



B.1 of this Agreement is unenforceable, the court is vested with the authority to reduce the time period, geographical area, and/or scope of restrained activities, so that the restrictions may be enforced to the fullest extent permitted by law. Additionally, if the Agent or its owners violate any of the restrictions contained in Section B.1 of this Agreement, the restrictive period shall be suspended and will not run in favor of the Agent from the time of the commencement of any such violation until the time when the Agent cures the violation to the Company's satisfaction.

C. **Miscellaneous**

1. **The Company's Remedies.** The Agent acknowledges that the restrictions contained in this Agreement, in view of the nature of the Company's business, are reasonable and necessary to protect the Company's legitimate business interests and that any violation of this Agreement would result in irreparable injury to the Company for which there is no adequate remedy at law. In the event of a breach or a threatened breach of any provision in this Agreement, the Company shall be entitled to a temporary restraining order and injunctive relief restraining the Agent, its owner, employees and representatives from the commission of any breach, and to recover the Company's attorneys' fees, costs and expenses related to the breach or threatened breach. Nothing contained in this Agreement shall be construed as prohibiting the Company from pursuing any other remedies available to it for any breach or threatened breach, including, without limitation, the recovery of money damages, equitable relief, attorneys' fees, and costs. The existence of any claim or cause of action by the Agent against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the Company's enforcement of this Agreement.

2. **Notification of Subsequent Employers.** If Agent or any of its owners, in the future, seeks or is offered employment by, or to serve as the independent agent for, any other company, firm, or person, the Agent shall provide, or shall cause to be provided, a copy of this Agreement to the other company before accepting employment with, or becoming an independent agent for, the other company.

3. **Oaths and Verifications.** The Agent agrees to execute any proper oath or verify any proper document required to carry out the terms of this Agreement.

4. **Governing Law and Consent to Personal Jurisdiction.** This Agreement is made and entered into within the State of Ohio and shall, in all respects, be interpreted, enforced, and governed under the laws of the State of Ohio without regard for conflicts of laws principles. The Agent consents to the personal jurisdiction of the state and federal courts located in the State of Ohio for any lawsuit the Company files against the Agent in Ohio related to this Agreement.

5. **Construction.** The language of this Agreement will be deemed the language chosen by the parties to express their mutual intent and shall, in all cases, be construed as a whole, according to its fair meaning, and not strictly for, or against, either party.

6. **Severability and Reformation.** Should a court determine that any paragraph or sentence, or any portion of a paragraph or sentence, of this Agreement is invalid, unenforceable, or void, this determination shall not have the effect of invalidating the remainder of the paragraph, sentence or any other provision of this Agreement. Further, the court should construe this Agreement by limiting and reducing it only to the extent necessary to be enforceable under then applicable law.

7. **Successors and Assigns.** This Agreement shall bind and inure to the benefit of the parties to it and their heirs, successors and assigns.

8. **No Waiver.** Any failure to enforce any provision of this Agreement shall not constitute a waiver thereof or of any other provision hereof.



14

9. **Counterparts.** The Company and the Agent agree that this Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same instrument.

10. **Excluded Accounts.** The Company and the Agent have agreed that certain accounts of the Agent are excluded from the operation of certain provisions of this Agreement and the Sales Agent Agreement as further detailed in Schedule B to the Sales Agent Agreement.

11. **Entire Agreement and Amendment.** This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior discussions between the parties with respect to the subject matter of this Agreement. This Agreement may not be amended, nor any obligation waived, except by a writing signed by both parties hereto.

IN WITNESS WHEREOF, the undersigned have executed Exhibit A of the Sales Agent Agreement as of the date first above written.

COMPANY:

First Star Logistics LLC

By: _____

Todd Hammerstrom

Its: Manager

AGENT NAME:

By: _____

Signature

Naul Urbres

Print Name

Its: _____

15

## SCHEDULE A

### Sales Commission

The following sales Commission, as defined and calculated in this Agreement, will be __%  for the term of this Agreement unless otherwise determined by the terms of this Agreement.

_____    Initials – FSL

_____    Initials – Agent

16

<u>SCHEDULE B</u>

Excluded Accounts

The Company and the Agent agree that the following accounts are existing, active accounts of the Agent opened prior to the execution of the Sales Agent Agreement and the Agreement Regarding Confidentiality, Non-Solicitation, Non-Recruitment, and Non-Competition. The following accounts are excluded from the operation of <u>Section 6.4</u> of the Sales Agent Agreement (Disposition of Customer Relationships on Termination) and from the operation of <u>Section B.1</u> and <u>Section B.2</u> of the Agreement Regarding Confidentiality, Non-Solicitation, Non-Recruitment, and Non-Competition. This Schedule B to the Sales Agent Agreement in no way excuses or limits the obligations of the Agent or the rights and remedies of the Company with regard to any other provision of the Sales Agent Agreement and the Agreement Regarding Confidentiality, Non-Solicitation, Non-Recruitment, and Non-Competition. Furthermore, any account listed on this schedule shall be removed from this schedule and not excluded if, during any 180 consecutive day period during the term of the Sales Agent Agreement, the Agent fails to generate any revenue (determined on an accrual basis) from that account.

[Sales Agent to attach list of accounts]



17

Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer
Identification Number and Certification**

Give Form to the
requester. Do not
send to the IRS.

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.
Paul Vic-Bres

2 Business name/disregarded entity name, if different from above
BullHead logistics LLC

3 Check appropriate box for federal tax classification; check only one of the following seven boxes:

☑ Individual/sole proprietor or    ☐ C Corporation    ☐ S Corporation    ☐ Partnership    ☐ Trust/estate
single-member LLC

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

Note. For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting code (if any)

(Applies to accounts maintained outside the U.S.)

5 Address (number, street, and apt. or suite no.)
40762 Morgain K

6 City, state, and ZIP code
Pollins MT 59931

Requester's name and address (optional)

**Part I    Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Note. If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

Social security number

Employer identification number

821-079311511

**Part II    Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

Sign
Here

Signature of
U.S. person ▶ _[signature]_    Date ▶ 5-19-17

**General Instructions**

Section references are to the Internal Revenue Code unless otherwise noted.

Future developments. Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at www.irs.gov/fw9.

**Purpose of Form**

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding? on page 2.

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See What is FATCA reporting? on page 2 for further information.

Cat. No. 10231X    Form **W-9** (Rev. 12-2014)

Form W-9 (Rev. 12-2014)

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, or 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on line 1 must sign. Exempt payees, see Exempt payee code earlier.

Signature requirements. Complete the certification as indicated in items 1 through 5 below.

1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983. You must give your correct TIN, but you do not have to sign the certification.

2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983. You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

3. Real estate transactions. You must sign the certification. You may cross out item 2 of the certification.

4. Other payments. You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions. You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account[1] |
| 3. Custodial account of a minor (Uniform Gift to Minors Act) | The minor[2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee[1] |
|    b. So-called trust account that is not a legal or valid trust under state law | The actual owner[1] |
| 5. Sole proprietorship or disregarded entity owned by an individual | The owner[3] |
| 6. Grantor trust filing under Optional Form 1099 Filing Method 1 (see Regulations section 1.671-4(b)(2)(i)(A)) | The grantor[2] |

| For this type of account: | Give name and SSN of: |
|---|---|
| 7. Disregarded entity not owned by an individual | The owner |
| 8. A valid trust, estate, or pension trust | Legal entity[4] |
| 9. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 10. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 11. Partnership or multi-member LLC | The partnership |
| 12. A broker or registered nominee | The broker or nominee |
| 13. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 14. Grantor trust filing under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulations section 1.671-4(b)(2)(i)(B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or DBA name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and enter the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see Special rules for partnerships on page 2.

*Note. Grantor also must provide a Form W-9 to trustee of trust.

Note. If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records from Identity Theft

Identity theft occurs when someone uses your personal information such as your name, SSN, or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

• Protect your SSN,
• Ensure your employer is protecting your SSN, and
• Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Publication 4535, Identity Theft Prevention and Victim Assistance.

Victims of identity theft who are experiencing economic harm or a system problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

Protect yourself from suspicious emails or phishing schemes. Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to phishing@irs.gov. You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration (TIGTA) at 1-800-366-4484. You can forward suspicious emails to the Federal Trade Commission at: spam@uce.gov or contact them at www.ftc.gov/idtheft or 1-877-IDTHEFT (1-877-438-4338).

Visit IRS.gov to learn more about identity theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you, mortgage interest you paid, the acquisition or abandonment of secured property, the cancellation of debt, or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their laws. The information also may be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payers must generally withhold a percentage of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to the payer. Certain penalties may also apply for providing false or fraudulent information.

nn0

Form W-9 (Rev. 12-2014)

## What is FATCA reporting?

## Updating Your Information

## Penalties

## Specific Instructions

### Line 1

## Backup Withholding



Form W-9 (Rev. 12-2014)

**Line 2**

If you have a business name, trade name, DBA name, or disregarded entity name, you may enter it on line 2.

**Line 3**

Check the appropriate box in line 3 for the U.S. federal tax classification of the person whose name is entered on line 1. Check only one box in line 3.

Limited Liability Company (LLC). If the name on line 1 is an LLC treated as a partnership for U.S. federal tax purposes, check the "Limited Liability Company" box and enter "P" in the space provided. If the LLC has filed Form 8832 or 2553 to be taxed as a corporation, check the "Limited Liability Company" box and in the space provided enter "C" for C corporation or "S" for S corporation. If it is a single-member LLC that is a disregarded entity, do not check the "Limited Liability Company" box; instead check the first box in line 3 "Individual/sole proprietor or single-member LLC."

**Line 4, Exemptions**

If you are exempt from backup withholding and/or FATCA reporting, enter in the appropriate space in line 4 any code(s) that may apply to you.

Exempt payee code.
• Generally, individuals (including sole proprietors) are not exempt from backup withholding.

• Except as provided below, corporations are exempt from backup withholding for certain payments, including interest and dividends.

• Corporations are not exempt from backup withholding for payments made in settlement of payment card or third party network transactions.

• Corporations are not exempt from backup withholding with respect to attorneys' fees or gross proceeds paid to attorneys, and corporations that provide medical or health care services are not exempt with respect to payments reportable on Form 1099-MISC.

The following codes identify payees that are exempt from backup withholding. Enter the appropriate code in the space in line 4.

1—An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2)

2—The United States or any of its agencies or instrumentalities

3—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

4—A foreign government or any of its political subdivisions, agencies, or instrumentalities

5—A corporation

6—A dealer in securities or commodities required to register in the United States, the District of Columbia, or a U.S. commonwealth or possession

7—A futures commission merchant registered with the Commodity Futures Trading Commission

8—A real estate investment trust

9—An entity registered at all times during the tax year under the Investment Company Act of 1940

10—A common trust fund operated by a bank under section 584(a)

11—A financial institution

12—A middleman known in the investment community as a nominee or custodian

13—A trust exempt from tax under section 664 or described in section 4947

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt payees except for 7 |
| Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 4 |
| Payments over $600 required to be reported and direct sales over $5,000[1] | Generally, exempt payees 1 through 5[2] |
| Payments made in settlement of payment card or third party network transactions | Exempt payees 1 through 4 |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney reportable under section 6045(f), and payments for services paid by a federal executive agency.

Exemption from FATCA reporting code. The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for accounts maintained outside of the United States by certain foreign financial institutions. Therefore, if you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements. A requester may indicate that a code is not required by providing you with a form W-9 with "Not Applicable" (or any similar indication) written or printed on the line for a FATCA exemption code.

A—An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37)

B—The United States or any of its agencies or instrumentalities

C—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

D—A corporation the stock of which is regularly traded on one or more established securities markets, as described in Regulations section 1.1472-1(c)(1)(i)

E—A corporation that is a member of the same expanded affiliated group as a corporation described in Regulations section 1.1472-1(c)(1)(i)

F—A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state

G—A real estate investment trust

H—A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940

I—A common trust fund as defined in section 584(a)

J—A bank as defined in section 581

K—A broker

L—A trust exempt from tax under section 664 or described in section 4947(a)(1)

M—A tax exempt trust under a section 403(b) plan or section 457(g) plan

Note. You may wish to consult with the financial institution requesting this form to determine whether the FATCA code and/or exempt payee codes should be completed.

**Line 5**

Enter your address (number, street, and apartment or suite number). This is where the requester of this Form W-9 will mail your information returns.

**Line 6**

Enter your city, state, and ZIP code.

**Part I. Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see How to get a TIN below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-member LLC that is disregarded as an entity separate from its owner (see Limited Liability Company (LLC) on this page), enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

Note. See the chart on page 4 for further clarification of name and TIN combinations.

How to get a TIN. If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local SSA office or get this form online at www.ssa.gov. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at www.irs.gov/businesses and clicking on Employer Identification Number (EIN) under Starting a Business. You can get Forms W-7 and SS-4 from the IRS by visiting IRS.gov or by calling 1-800-TAX-FORM (1-800-829-3676).

If you are asked to complete Form W-9 but do not have a TIN, apply for a TIN and write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

Note. Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

Caution: A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.

# APPENDIX C

Raul Invoiced Loads

| Invoice # | Pro # | Customer Name | Vendor Inv Date | Due Date | Orig Inv Amount | Balance Due |
|---|---|---|---|---|---|---|
| 74071 | 87062 | NATHEL AND NATHEL INC | 1/16/2018 | 1/23/2018 | 280 | 280 |
| 73577 | 89053 | HEARTLAND PRODUCE COMPANY | 1/11/2018 | 1/18/2018 | 140 | 140 |
| 73280 | 89443 | HEARTLAND PRODUCE COMPANY | 1/8/2018 | 1/15/2018 | -1,000.00 | -1,000.00 |
| 72829 | 87214 | HEARTLAND PRODUCE COMPANY | 1/3/2018 | 1/10/2018 | -116 | -116 |
| 72828 | 87677 | NATHEL AND NATHEL INC | 1/3/2018 | 1/10/2018 | -140 | -140 |
| 72066 | | | 12/27/2017 | 1/3/2018 | -15,400.00 | -15,400.00 |
| 71737 | 90388 | HEARTLAND PRODUCE COMPANY | 12/21/2017 | 12/28/2017 | 280 | 280 |
| 71735 | 90169 | HEARTLAND PRODUCE COMPANY | 12/21/2017 | 12/28/2017 | 210 | 210 |
| 71733 | 90167 | HEARTLAND PRODUCE COMPANY | 12/21/2017 | 12/28/2017 | 140 | 140 |
| 71728 | 89804 | HEARTLAND PRODUCE COMPANY | 12/21/2017 | 12/28/2017 | 44.8 | 44.8 |
| 71720 | 89614 | HEARTLAND PRODUCE COMPANY | 12/21/2017 | 12/28/2017 | 140 | 140 |
| 71718 | 89495 | HEARTLAND PRODUCE COMPANY | 12/21/2017 | 12/28/2017 | 280 | 280 |
| 71716 | 87955 | HEARTLAND PRODUCE COMPANY | 12/21/2017 | 12/28/2017 | 140 | 140 |
| 71714 | 87307 | NATHEL AND NATHEL INC | 12/21/2017 | 12/28/2017 | 280 | 280 |
| 71712 | 87290 | HEARTLAND PRODUCE COMPANY | 12/21/2017 | 12/28/2017 | 140 | 140 |
| 71452 | 87668 | HEARTLAND PRODUCE COMPANY | 12/20/2017 | 12/27/2017 | -87.5 | -87.5 |
| 70736 | 83690 | TRAVERS FRUIT COMPANY | 12/13/2017 | 12/20/2017 | -4,178.58 | -4,178.58 |
| 70732 | | | 12/13/2017 | 12/20/2017 | -500 | -500 |
| 70314 | 87677 | NATHEL AND NATHEL INC | 12/8/2017 | 12/15/2017 | 140 | 140 |
| 70250 | 85472 | GINO PINTO INC | 12/8/2017 | 12/15/2017 | -280 | -280 |
| 70064 | 89014 | HEARTLAND PRODUCE COMPANY | 12/6/2017 | 12/13/2017 | -41.4 | -41.4 |
| 70033 | 86225 | HEARTLAND PRODUCE COMPANY | 12/6/2017 | 12/13/2017 | -144.9 | -144.9 |
| 70032 | 84569 | HEARTLAND PRODUCE COMPANY | 12/6/2017 | 12/13/2017 | -210 | -210 |
| 70031 | 85073 | HEARTLAND PRODUCE COMPANY | 12/6/2017 | 12/13/2017 | -140 | -140 |
| 70028 | 86229 | HEARTLAND PRODUCE COMPANY | 12/6/2017 | 12/13/2017 | -945 | -945 |
| 69936 | | | 12/6/2017 | 12/13/2017 | -500 | -500 |
| 69641 | 88384 | HEARTLAND PRODUCE COMPANY | 12/1/2017 | 12/8/2017 | 210 | 210 |
| 69638 | 88340 | HEARTLAND PRODUCE COMPANY | 12/1/2017 | 12/8/2017 | 210 | 210 |
| 69637 | 87895 | HEARTLAND PRODUCE COMPANY | 12/1/2017 | 12/8/2017 | 140 | 140 |
| 69631 | 87514 | HEARTLAND PRODUCE COMPANY | 12/1/2017 | 12/8/2017 | 140 | 140 |
| 69625 | 87512 | HEARTLAND PRODUCE COMPANY | 12/1/2017 | 12/8/2017 | 140 | 140 |
| 69622 | 87214 | HEARTLAND PRODUCE COMPANY | 12/1/2017 | 12/8/2017 | -24 | -24 |
| 69501 | 89177 | HEARTLAND PRODUCE COMPANY | 11/30/2017 | 12/7/2017 | 210 | 210 |
| 69158 | | | 11/29/2017 | 12/6/2017 | -500 | -500 |
| 68965 | 84381 | Reaves Brokerage Company | 11/27/2017 | 12/4/2017 | -311.6 | -311.6 |
| 68572 | | | 11/22/2017 | 11/29/2017 | -500 | -500 |
| 67708 | | | 11/15/2017 | 11/22/2017 | -500 | -500 |
| 67366 | 86780 | TRAVERS FRUIT COMPANY | 11/17/2017 | 11/24/2017 | 350 | 350 |
| 67160 | 78711 | SCOTT & ALLEN | 11/10/2017 | 11/17/2017 | -3,910.00 | -3,910.00 |
| 67022 | 87481 | HEARTLAND PRODUCE COMPANY | 11/9/2017 | 11/16/2017 | -42 | -42 |
| 67020 | 88415 | HEARTLAND PRODUCE COMPANY | 11/9/2017 | 11/16/2017 | 140 | 140 |
| 67018 | 87230 | HEARTLAND PRODUCE COMPANY | 11/9/2017 | 11/16/2017 | 280 | 280 |
| 67016 | 87706 | HEARTLAND PRODUCE COMPANY | 11/9/2017 | 11/16/2017 | 140 | 140 |
| 66975 | | | 11/8/2017 | 11/15/2017 | -500 | -500 |
| 66974 | | | 11/8/2017 | 11/15/2017 | -500 | -500 |
| 66842 | 84379 | Reaves Brokerage Company | 11/7/2017 | 11/14/2017 | -656.8 | -656.8 |
| 66836 | 78280 | NATHEL AND NATHEL INC | 11/7/2017 | 11/14/2017 | -168 | -168 |
| 65850 | 87556 | HEARTLAND PRODUCE COMPANY | 10/30/2017 | 11/6/2017 | 140 | 140 |
| 65369 | | | 10/25/2017 | 11/1/2017 | -500 | -500 |
| 65152 | 86608 | HEARTLAND PRODUCE COMPANY | 10/24/2017 | 10/31/2017 | 140 | 140 |
| 64926 | 87475 | HEARTLAND PRODUCE COMPANY | 10/20/2017 | 10/27/2017 | 210 | 210 |
| 64825 | 85584 | NATHEL AND NATHEL INC | 10/20/2017 | 10/27/2017 | -70 | -70 |

Page 1 of 2

# Original Invoice

PRO # 87307

**FIRST STAR LOGISTICS**

First Star Logistics, LLC
P.O. Box 912394
Denver, CO 80291-2394

(812) 637-3251
(302) 450-4181 Fax

Bill Ref: 10/10/17

| SHIP DATE | DELIV DATE |
|---|---|
| | 10/15/17 |

| INVOICE DATE | DUE DATE |
|---|---|
| 01/16/18 | 01/23/18 |

| SHIPMENT TYPE | CONT TRAILER # | MILES / CLASS |
|---|---|---|
| Reefer | | |

### CUSTOMER

CLASSIC PRODUCE INC
581 AUSTIN PLACE
Bronx, NY 10455

| PICK UP | CONSIGNEE |
|---|---|
| YOGI PRODUCE<br>5614 LINCOLN BLVD<br>Livingston, CA 95334<br><br>Ref# TRAVERS | NATHEL & NATHEL<br>357 HUNTS POINT MARKET<br>BRONX, NY 10474<br><br>Ref# |

### EXTRA PICKS & STOPS

| DESCRIPTION | WEIGHT | RATE | TOTAL |
|---|---|---|---|
| | | 6,500.00 | 6,500.00 |
| Rate Type: Flat | | | |

TOTAL CHARGES ▶ $ 6,500.00

39128

If there are any discrepancies or if you have received this invoice in error, please email
invoicing@firststarllc.com.

CLASSIC PRODUCE INC
581 AUSTIN PLACE
Bronx, NY 10455

# STRAIGHT BILL OF LADING FOR EXEMPT COMMODITIES - ORIGINAL NON-NEGOTIABLE

Shipper:
YAGI BROTHERS PRODUCE, INC.
P.O. BOX 515
LIVINGSTON, CA 95334
GGN 859061002009
(209) 894-7311

**I 2227333**

Ship: Oct 10, 2017
Load:
Out:
By:
ver:
ver Lic:

Order #: 46763
Cust PO: JK 199
Terms: FOB
Shipman: Duane Hutton
Truck Lic:
Trailer Lic:

To (Consignee):
CLASSIC PRODUCE
581 AUSTIN PLACE
BRONX NY 10455-3890

Destination:  Telephone: (718) 993-3330
CLASSIC PRODUCE
581 AUSTIN PLACE
BRONX NY 10455-3890

555-326-3320

Page 1 of 1

| Carrier: CLASSIC PRODUCE | Carrier Arranged By: | Temp Degrees F. | Low: 60 | High: 60 |
| | Truck Brkr: | Ship Via: Truck | Loaded At: Primary Location |

Ship Charges Paid By:

Reporting Instructions:

| | Shipped | | |
|---|---|---|---|
| 280 | | Japanese GG Certified Yam #1 Kokuma | 11760 |
| 728 | | Japanese GG Certified Yam Jumbo Dandy Jumbo | 30576 |
| 1008 | | | 42336 |

Trailer inspected for cleanliness, odors and defects.
PRODUCE OF USA

RECEIVED UNDER PROTEST
TO USDA INSPECTION

Inspection:      Recorder No:       Chart No:

Loading Instructions:

Delivery Instructions:

Billing Instructions:

### Contract Terms and Conditions

1. Where used in this Bill of Lading, the term Carrier means the person, firm, or corporation operating the motor vehicle and in possession of the property under this contract; and the execution of this contract by the Carrier shall bind jointly, and severally, the person, firm or corporation owning or operating the motor vehicle. The Carrier assumes full responsibility for any and all loss, damage or delay to the property while in its possession and until delivery to the consignee except when the loss, damage, or delay is caused by an act of God, act of public enemy, or by an act or omission of the shipper or consignee.

2. The Carrier agrees to transport property under protective service, at the temperature specified, between the origin and destination shown in this contract and to deliver the property to the consignee in good condition at the delivery time specified, if any. In the event the Carrier fails to so transport and deliver the property, then the Carrier agrees to pay the owner of the property for the actual loss or injury to the property resulting from such failure.

3. It is further agreed that if no specific delivery time is stated on the contract, then timely delivery of the property will be based on the Carrier's usual and normal schedule for perishable shipments transported with reasonable dispatch between the points shown on this contract. The Carrier represents that the delivery can be performed without violating any local, state or federal traffic or safety laws and regulations, and that it has complied and will comply with all laws and regulations of local, state and federal authorities which could affect this transportation or agreement.

4. Claims against either or both the Carrier and Truck Broker, if any, must be filed within nine months of delivery, or in the case of failure to make delivery, then within nine months after a reasonable time for delivery has elapsed. Such claims may be filed either with a Carrier or Truck Broker, if any.

5. The Carrier warrants and represents to shipper and consignee, or other owner of the shipment, that the motor vehicle described in this contract is covered by a valid effective insurance policy, in at least the amounts prescribed by the federal government. It is further represented that this shipment is covered by a presently effective cargo insurance policy in at least the amount of $25,000.00 and that additional coverage will be obtained to cover the actual value of the shipment if the shipper states the value on the face of this contract.

6. All parties acknowledge that the Truck Broker, for compensation received from the Carrier, has acted as the Carrier's agent. It is acknowledged that the shipper or consignee has relied on the Truck Broker in securing adequate and satisfactory transportation services, and that the Truck Broker agrees to indemnify and hold harmless the shipper or consignee or other owners of the property transported from any loss due to the Carrier's negligence, act of commission, or any failure to fully perform and comply with the terms of this agreement.

RECEIVED from the shipper named herein, the perishable property described in good order and condition, except as noted, marked, consigned and destined as indicated, pursuant to an agreement (arranged by the truck broker, name herein, if any), whereby the carrier, in consideration of the transportation charges to be paid, agrees to carry and deliver said property to the consignee, subject only to the terms and conditions of this contract, which may be printed or written on the face or back hereof, which are hereby agreed to by the carrier, shipper, and the truck broker if any.

Shipper: _Duane Hutton_      Date: _____

Carrier: _____      Date: _____
Received above in good shipping condition and verified count.

Consignee: _____    Date: _____
Received above perishable property in good order, except as noted.

# FIRST ST★R LOGISTICS

First Star Logistics, LLC
P.O. Box 912394
Denver, CO 80291-2394

(812) 637-3251
(302) 450-4181 Fax

Bill Ref: 10/5/17

## Original Invoice

PRO # 87062

| SHIP DATE | | DELIV DATE |
|---|---|---|
| | | 10/10/17 |

| INVOICE DATE | | DUE DATE |
|---|---|---|
| 01/16/18 | | 01/23/18 |

| SHIPMENT TYPE | CONT / TRAILER # | MILES / CLASS |
|---|---|---|
| Reefer | | |

| CUSTOMER |
|---|
| CLASSIC PRODUCE INC<br>581 AUSTIN PLACE<br>Bronx, NY 10455 |

| PICK UP | CONSIGNEE |
|---|---|
| ALLIED AVOCADOS & CITRUS<br>348 A STREET<br>Fillmore, CA 93015<br><br>Ref# 2597 | CLASSIC PRODUCE<br>571 AUSTIN PL<br>Bronx, NY 10455<br><br>Ref# |

| EXTRA PICKS & STOPS |
|---|
| |

| DESCRIPTION | WEIGHT | RATE | TOTAL |
|---|---|---|---|
| | | 8,400.00 | 8,400.00 |
| Rate Type: Flat | | | |

39127

| | TOTAL CHARGES ▶ | $ | 8,400.00 |
|---|---|---|---|

If there are any discrepancies or if you have received this invoice in error, please email
invoicing@firststarllc.com.

CLASSIC PRODUCE INC
581 AUSTIN PLACE
Bronx, NY 10455

# FIRST STAR LOGISTICS

## Customer Load Confirmation

### PRO # 87062

First Star Logistics, LLC
P. O. Box 498459
Cincinnati, OH 45249
(812) 637-3251

| CUSTOMER | CONTACT |
|---|---|
| CLASSIC PRODUCE INC | |

| PHONE | FAX |
|---|---|
| 718-822-2806 | |

| DATE | TIME | QUOTE # |
|---|---|---|
| 10-10-17 | 6AM | 87062FS |

| REF # | TYPE | SIZE |
|---|---|---|
| 2597 | Reefer | |

### PICKS & STOPS

| Name | City, State | Date | Time | REF # |
|---|---|---|---|---|
| ALLIED AVOCADOS & CITRUS | Fillmore, CA | 10-06-17 | | 2597 |
| CLASSIC PRODUCE | Bronx, NY | 10-10-17 | 6AM | |

| CHARGES | SHIPMENT DETAILS |
|---|---|
| $8,400.00 LINE HAUL | Pieces |
| | Weight |
| | Desc |
| $8,400.00 Total Rate | |

### SPECIAL INSTRUCTIONS

Signature _____

Date _____ / _____ / _____
         M      D      Y

Return To: Krista S
First Star Logistics, LLC
P. O. Box 498459
Cincinnati, OH 45249
(812) 637-3251

# Original Invoice

**PRO #** 80532

*FIRST STAR LOGISTICS*

First Star Logistics, LLC
P.O. Box 912394
Denver, CO 80291-2394

(512) 537-3251
(302) 450-4181 Fax

Bill Ref: 6/7/17

| SHIP DATE | DELIV DATE |
|---|---|
| | 06/14/17 |

| INVOICE DATE | DUE DATE |
|---|---|
| 01/10/18 | 01/17/18 |

| SHIPMENT TYPE | CONT / TRAILER # | MILES / CLASS |
|---|---|---|
| Reefer | | |

**CUSTOMER**

CLASSIC PRODUCE INC
581 AUSTIN PLACE
Bronx, NY 10455

| PICK UP | CONSIGNEE |
|---|---|
| KINGS RIVER PRODUCE<br>21083 E TREIMMER SPRIN<br>SANGER, CA 93657<br><br>Ref# 1037715 | CLASSIC PRODUCE<br>571 AUSTIN PL<br>Bronx, NY 10455<br><br>Ref# 202721 |

**EXTRA PICKS & STOPS**

| DESCRIPTION | WEIGHT | RATE | TOTAL |
|---|---|---|---|
| | | 8,000.00 | 8,000.00 |
| Rate Type: Flat | | | |

| | | TOTAL CHARGES ▶ | $ 8,000.00 |
|---|---|---|---|

38909

If there are any discrepancies or if you have received this invoice in error, please email
invoicing@firststarllc.com.

CLASSIC PRODUCE INC
581 AUSTIN PLACE
Bronx, NY 10455

## STRAIGHT BILL OF LADING FOR EXEMPT COMMODITIES - ORIGINAL NON-NEGOTIABLE



**KING'S RIVER**
PACKING

| | |
|---|---|
| Ship: | Jun 08, 2017 |
| Divr By: | |
| Driver: | JAMES |
| Driver Lic: | P |

| | |
|---|---|
| Order #: | 292721 |
| Cust PO: | |
| Terms: | --FOB-- |
| Slsprsn: | JESSE SILVA |
| Truck Lic: | |
| Trailer Lic: | 221324A ME |

To (Consignee):

CLASSIC PRODUCE, INC.
581 AUSTIN PL.
BRONX NY 10455-3890

Destination:

CLASSIC PRODUCE, INC.
581 AUSTIN PL.
BRONX NY 10455-3890

Telephone: (718) 993-3330                          Page 1 of 1

| | | | |
|---|---|---|---|
| Carrier: U.N.C. | Truck Brkr: | Temp Degrees F. | Low: 38   High: 41 |
| | | Ship Via: Truck | Loaded At: SANGER, CA |
| | | Ship Charges Paid By: | |

Reporting Instructions:

| Shipped | Description |
|---|---|
| 420 | VALENCIA ORANGES VEXBAG 12-3# CHOICE 072 PROD OF CA - USA |
| 252 | VALENCIA ORANGES VEXBAG 10-4# CHOICE 056 PROD OF CA - USA |
| 162 | VALENCIA ORANGES CARTONS CHOICE 088 PROD OF CA - USA |
| 54 | VALENCIA ORANGES CARTONS CHOICE 113 PROD OF CA - USA |
| 888 | |
| 20 | PALLETS . YES |

*Arrivo 6/13/17 @ 1.30 AM*

*Unloaded 6/14/17 @ 11.30 AM*

| | | | |
|---|---|---|---|
| Inspection: | Recorder No: | Chart No: | |

Loading Instructions:

Delivery Instructions:                          Temperature recorder on truck verified by:

RECEIVED from the shipper named herein, the perishable property described in good order and condition, except as noted, marked, consigned and destined as indicated, pursuant to an agreement arranged by the truck broker, name herein, if any), whereby the carrier, in consideration of the transportation charges to be paid, agrees to carry and deliver said property to the consignee, subject only to the terms and conditions of this contract, which may be printed or written on the face or back hereof, which are hereby agreed to by the carrier, shipper, and the truck broker if any.

Trailer inspection: Interior must be clean, intact, no holes or acquisitions that inhibit trailer to maintain required temp. Trailer must not have odors & must not have hauled any previous raw products other than produce without cleaning. Do not load if specifications are not met.

*Unless otherwise stated, all sales are made on an FOB, no grade basis, excluding interstate.

| | | | | |
|---|---|---|---|---|
| CHECK IN TIME: | Jun 08, 2017 18:22 | Shipper: | | Date 6/8/2017 |
| APPT TIME: | | Driver: X | | Date 5/8/2017 |
| | | Received above in good shipping condition and verified count, and are satisfied that said otherwise is loaded and properly braced. | | |
| CHECK OUT TIME: | Jun 08, 2017 18:52 | | | |
| | | Consignee: | | Date _____ |
| | | Received above perishable property in good order, except as noted. | | |

<u>VERIFICATION</u>

I, Todd Hammerstrom, am Vice President of First Star Logistics, LLC. I have reviewed the factual allegations contained in the Verified Complaint for Temporary Restraining Order, Preliminary and Permanent Injunctive Relief and Damages and verify the allegations to be true and correct to the best of my knowledge and belief.

Dated this 14 day of February, 2018.

_____
Todd Hammerstrom

County of Hamilton  )
State of Ohio        )

Subscribed and sworn to before me this 8 day of February, 2018.

_____
Notary Public

My Commission Expires:

10-14-18

[SEAL]

Stephanie Bailey
Notary Public, State of Ohio
My Commission Expires 10-14-2018

Raul Invoiced Loads

| Invoice # | Pro # | Customer Name | Vendor Inv Date | Due Date | Orig Inv Amount | Balance Due |
|---|---|---|---|---|---|---|
| 64674 | 83939 | CLASSIC PRODUCE INC | 10/19/2017 | 11/14/2017 | 128 | 0 |
| 64643 | 81928 | Carbonella & Desarbo | 10/18/2017 | 10/25/2017 | -4,500.00 | -4,500.00 |
| 64350 | 86597 | HEARTLAND PRODUCE COMPANY | 10/17/2017 | 10/24/2017 | 140 | 140 |
| 64349 | 86471 | HEARTLAND PRODUCE COMPANY | 10/17/2017 | 10/24/2017 | 140 | 140 |
| 64345 | 86207 | HEARTLAND PRODUCE COMPANY | 10/17/2017 | 10/24/2017 | 140 | 140 |
| 63504 | 85444 | HEARTLAND PRODUCE COMPANY | 10/10/2017 | 10/17/2017 | 140 | 140 |
| 62618 | 85157 | CLASSIC PRODUCE INC | 10/3/2017 | 10/10/2017 | 210 | 210 |
| 62514 | 86059 | HEARTLAND PRODUCE COMPANY | 10/3/2017 | 10/10/2017 | -54 | -54 |
| 62509 | 84668 | HEARTLAND PRODUCE COMPANY | 10/3/2017 | 10/10/2017 | -54 | -54 |
| 59190 | 84800 | CLASSIC PRODUCE INC | 9/6/2017 | 9/13/2017 | 280 | 280 |
| 57196 | 84080 | HEARTLAND PRODUCE COMPANY | 8/21/2017 | 8/28/2017 | 140 | 140 |
| | | | | | | |
| | | | | | | $ (30,618.98) |

Raul Open Invoices

| Customer Name | Invoice # | Pro # | Billing Ref # | Inv Date | Due Date | Invoice Amt | Balance Due | Current | Over 30 | Over 60 | Over 90 | Over 120 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CLASSIC PRODUCE INC | 38909 | 80532 | 6/7/2017 | 1/10/2018 | 1/17/2018 | 8,000.00 | 8,000.00 | 8,000.00 | | | | |
| CLASSIC PRODUCE INC | 35467 | 84457 | 3/18/2017 | 10/20/2017 | 10/20/2017 | 3,200.00 | 3,200.00 | | | 3,200.00 | | |
| CLASSIC PRODUCE INC | 35398 | 84244 | 8/15/2017 | 10/19/2017 | 10/19/2017 | 4,800.00 | 4,800.00 | | | 4,800.00 | | |
| CLASSIC PRODUCE INC | 35374 | 83939 | 9/9/2017 | 10/19/2017 | 10/19/2017 | 6,000.00 | 6,000.00 | | | 6,000.00 | | |
| CLASSIC PRODUCE INC | 35172 | 84629 | 8.24.17 | 10/16/2017 | 10/16/2017 | 4,200.00 | 4,200.00 | | | 4,200.00 | | |
| CLASSIC PRODUCE INC | 34662 | 94340 | 8/16/17 OXNARD | 10/4/2017 | 10/4/2017 | 5,800.00 | 5,800.00 | | | 5,800.00 | | |
| CLASSIC PRODUCE INC | 34618 | 85157 | 8/30/2017 | 10/3/2017 | 10/3/2017 | 6,700.00 | 6,700.00 | | | | | 6,700.00 |
| CLASSIC PRODUCE INC | 34581 | 85513 | 9/7/2017 | 10/3/2017 | 10/3/2017 | 4,100.00 | 4,100.00 | | | | | 4,100.00 |
| CLASSIC PRODUCE INC | 33898 | 85183 | 8/31/2017 | 9/19/2017 | 9/19/2017 | 4,000.00 | 4,000.00 | | | | | 4,000.00 |
| CLASSIC PRODUCE INC | 33896 | 84442 | 8/17/2017 | 9/19/2017 | 9/19/2017 | 3,900.00 | 3,900.00 | | | | | 3,900.00 |
| CLASSIC PRODUCE INC | 33934 | 84600 | 8/24/2017 | 9/6/2017 | 9/6/2017 | 7,100.00 | 7,100.00 | | | | | 7,100.00 |
| CLASSIC PRODUCE INC | 33136 | 84107 | 8/12/2017 | 9/1/2017 | 9/1/2017 | 3,800.00 | 3,800.00 | | | | | 3,800.00 |
| CLASSIC PRODUCE INC | 32838 | 84508 | 8/18/2017 | 8/28/2017 | 8/28/2017 | 4,200.00 | 4,200.00 | | | | | 4,200.00 |
| CLASSIC PRODUCE INC | 32552 | 84020 | 8/10/17 CITRUS | 8/21/2017 | 8/21/2017 | 5,900.00 | 5,900.00 | | | | | 5,900.00 |
| CLASSIC PRODUCE INC | 32182 | 83451 | 8/1/17 CITRUS | 8/15/2017 | 8/15/2017 | 6,000.00 | 6,000.00 | | | | | 6,000.00 |
| CLASSIC PRODUCE INC | 32663 | 83665 | 8/4/2017 | 8/11/2017 | 8/11/2017 | 4,100.00 | 4,100.00 | | | | | 4,100.00 |
| CLASSIC PRODUCE INC | 39129 | 87307 | 10/16/2017 | 1/16/2018 | 2/15/2018 | 6,500.00 | 6,500.00 | 6,500.00 | | | | |
| CLASSIC PRODUCE INC | | 87062 | 10/5/2017 | | | 8,400.00 | 8,400.00 | 8,400.00 | | | | |
| | | | | | | | $ 96,700.00 | | | | | |

Page 1 of 1

# APPENDIX D

# AMERICAN RIDGEBACK, LLC

Q New Search          Manage this Business     $ Calculate List Fees      🖶 Printer Friendly

## Business Entity Information

| | | | |
|---|---|---|---|
| Status: | Active | File Date: | 8/15/2017 |
| Type: | Domestic Limited-Liability Company | Entity Number: | E0388492017-7 |
| Qualifying State: | NV | List of Officers Due: | 8/31/2018 |
| Managed By: | Managers | Expiration Date: | |
| NV Business ID: | NV20171516154 | Business License Exp: | 8/31/2018 |

## Additional Information

| | |
|---|---|
| Central Index Key: | |

## Registered Agent Information

| | | | |
|---|---|---|---|
| Name: | UNITED STATES CORPORATION AGENTS, INC. | Address 1: | 500 N RAINBOW BLVD STE 300A |
| Address 2: | | City: | LAS VEGAS |
| State: | NV | Zip Code: | 89107 |
| Phone: | | Fax: | |
| Mailing Address 1: | | Mailing Address 2: | |
| Mailing City: | | Mailing State: | NV |
| Mailing Zip Code: | | | |
| Agent Type: | Commercial Registered Agent - Corporation | | |
| Jurisdiction: | NEVADA | Status: | Active |

View all business entities under this registered agent

## Financial Information

| | | | |
|---|---|---|---|
| No Par Share Count: | 0 | Capital Amount: | $ 0 |

**No stock records found for this company**

## — Officers ☐ Include Inactive Officers

Manager - GABRIELA ONET

| | | | |
|---|---|---|---|
| Address 1: | 2235 EAST FLAMINGO ROAD | Address 2: | |
| City: | LAS VEGAS | State: | NV |
| Zip Code: | 89119 | Country: | |
| Status: | Active | Email: | |

## — Actions\Amendments

Click here to view 4 actions\amendments associated with this company

# APPENDIX E





**Licensing and Insurance Public**

## Authority History

| US DOT: | 3035869 | | Docket Number: | MC941951 | | |
|---------|---------|---|----------------|----------|---|---|
| Legal Name: | AMERICAN RIDGEBACK LLC | | | | | |
| **Sub** | **Auth Type** | | **Original Action** | | | **Disposition** |
| | MOTOR PROPERTY COMMON CARRIER | | DISMISSED | 09/14/2017 | | |
| | PROPERTY BROKER | | GRANTED | 09/19/2017 | | |

| Carrier Details | Active/Pending Insurance | Rejected Insurance | Insurance History | Pending Application | Revocation |

February 5, 2018

Federal Motor Carrier Safety Administration
1200 New Jersey Avenue SE, Washington, DC 20590 · 1-800-832-5660 · TTY: 1-800-877-8339 · Field Office Contacts

FMCSA Home | DOT Home | Feedback | Privacy Policy | USA.gov | Freedom of Information Act (FOIA) | Accessibility | OIG Hotline | Web Policies and Important Links | Plug-ins | Related Sites | Help

12/27/2017

SAFER Web - Company Snapshot AMERICAN RIDGEBACK LLC

# Company Snapshot
## AMERICAN RIDGEBACK LLC
USDOT Number: 3035869

○ USDOT Number ○ MCMX Number ○ Name

Enter Value: 3035869

[Search]

### ID/Operations | Inspections/Crashes In US | Inspections/Crashes In Canada | Safety Rating

Carriers: If you would like to update the following ID/Operations information, please complete and submit form MCS-150 which can be obtained online or from your State FMCSA office. If you would like to challenge the accuracy of your company's safety data, you can do so using FMCSA's DataQs system.

Carrier and other users: FMCSA provides the Company Safety Profile (CSP) to motor carriers and the general public interested in obtaining greater detail on a particular motor carrier's safety performance then what is captured in the Company Snapshot. To obtain a CSP please visit the CSP order page or call (800)832-5660 or (703)280-4001 (Fee Required).

For help on the explanation of individual data fields, click on any field name or for help of a general nature go to SAFER General Help.

The information below reflects the content of the FMCSA management information systems as of 12/26/2017. Carrier VMT Outdated.

Other Information for this Carrier
○ SMS Results
○ Licensing & Insurance

| Entity Type: | CARRIER/FREIGHT FORWARDER/BROKER | | | |
|---|---|---|---|---|
| Operating Status: | AUTHORIZED FOR BROKER Property | | Out of Service Date: | None |
| Legal Name: | AMERICAN RIDGEBACK LLC | | | |
| DBA Name: | | | | |
| Physical Address: | AR LOGISTICS 37 WELLLETS WAY NEWBURGH, NY 12550 | | | |
| Phone: | (914) 806-0800 | | | |
| Mailing Address: | 37 WELLETS WAY NEWBURGH, NY 12550-8781 | | | |
| USDOT Number: | 3035869 | | State Carrier ID Number: | |
| MCMX/FF Number(s): | MC-41961 | | DUNS Number: | - |
| Power Units: | 0 | | Drivers: | 0 |
| MCS-150 Form Date: | 08/07/2017 | | MCS-150 Mileage (Year): | |
| Operation Classification: | | | | |

| | X Auth. For Hire | Priv. Pass.(Non-business) | State Gov't |
| | X Exempt For Hire | | Local Gov't |

https://safer.fmcsa.dot.gov/query.asp

1/4

# APPENDIX F

12/27/2017

Gmail - Fwd: American Ridgeback LLC dba AR Logistics - Carrier Load Rate Confirmation (ARLG-01:242463)

To: <tigrangevorgyan1961@yahoo.com>
CC: <americanridgeback@gmail.com>

## BAMWire ~ Carrier Load Rate Confirmation (ARLG-01:242463)

**This is an addendum to the Carrier Agreement between American Ridgeback LLC dba AR Logistics, Newburgh, NY an ICC licensed Broker (MC 041361) hereinafter known as BROKER and the actual carrier as set forth below.**

### Broker Information

| | | | | |
|---|---|---|---|---|
| Broker: | American Ridgeback LLC dba AR Logistics | Agent Name: | Raul Victores | Address: 37 Willets Way |
| Comp Phone: | 914-086-0980 | Agent Phone: | 406-844-0796 | Newburgh, NY 12550 |
| Comp Fax: | | Agent Fax: | | |

### Carrier Information

| | | | | |
|---|---|---|---|---|
| Carrier: | HGT EXPRESS INC | Phone: | 8185772226 | Contact Name: |
| Attention: | | Fax: | | Dispatch Email: |

### Load Information

| | | | |
|---|---|---|---|
| Miles: | | Quantity: | 8.00 | Length: |
| Weight: | | Equipment Type: | Reefer | Width: |
| Commodity: | POTATOES | Temperature: | | Height: |

### PICKUP

(1): VICTOR PRODUCE, 14588 ATWATER JORDAN ROAD CA 95334
Phone:
PO: travers 12/14/17 PU: travers BOL QTY: 9
Additional Info/Instructions:
CHECK FOR RECORDER RUN CONTINUOUS PRE COOL TRAILER 36 DEGREES. DISPATCH MUST CHECKIN DAILY WITH BROKER
718 612 3183 BEFORE NOON EASTERN TIME
Earliest Time: 12/14/2017 12:00
Latest Time: 12/14/2017 12:00

### Pick Up (Load)

(2): Guadalupe Cooling, 2040 Guadalupe Road Nipomo CA 93444
Phone:
PO: WILL UPDATE PU: WILLUPDATE BOL. QTY: N/A
Additional Info/Instructions:
APPOINTMENT ONLY WILL MAKE IN THE A.M.
Earliest Time: 12/14/2017 :
Latest Time: 12/15/2017 :

https://mail.google.com/mail/u/0/?ui=2&ik=4d61d93a12&jsver=1QCtYkmIuA4.en.&view=pt&search=inbox&th=1609b9b5c15c7c7d&siml=1609b9b5c15c7c7d

1/7

12/27/2017

Gmail - Fred: American Ridgeback LLC dba AR Logistics - Carrier Load Rate Confirmation (ARLG-01.2A2463)

Page 1 of 2

**Pick Up (Load)**
(3): DOVE COOLER, 1731 RAILROAD STREET OCEANO CA 93475
Phone:
PO: WILL UPDATE PU: WILL UPDATE BOL: WILL UPDATE QTY: N/A
Additional Information/Instructions:
FIRST COME FIRST SERVE
Earliest Time: 12/14/2017 :
Latest Time: 12/15/2017 :

**DELIVERY**
(4): TRAVERS FRUIT COMPANY, 1-8 NEW ENGLAND PRODUCE CENTER MA 02150
Phone: 6172670170
PO: travers 12/14/17 PU: travers BOL: QTY:
Additional Information/Instructions:
DELIVER 11PM DRIVER CAN DELIVER MONDAY AS WELL NOTIFY BROKER IF EXTRA TIME IS NEEDED
Earliest Time: 12/17/2017 12:00
Latest Time: 12/17/2017 12:00

**Pricing Information**

| Payment Includes: | | Fuel Advance? | Yes | Tendered: | $8,500.00 |
|---|---|---|---|---|---|
| Base Charge: | 8,500.00 | Percent: | 40% | Fuel Advance Fee: | ($170.00) |
| Fuel Surcharge: | 0.00 | Amount: | $3,400.00 | | |
| Accessorial Charge: | 0.00 | Payment Terms: | 2 Days | | |
| | | Percent: | 100% | | |
| | | Amount: | $8,500.00 | Total Payment: | $8,330.00 |
| | | Fuel Advance: | ($3,400.00) | | |
| | | Fuel Advance Fee: | ($170.00) | | |
| | | Payment: | $4,930.00 | | |

Carrier agrees that for the above sum, Carrier will perform transport services for AMERICAN RIDGEBACK LLC DBA AR LOGISTICS

Carrier agrees and understands that this contract is NOT "TRIP LEASE" and that Carrier is an "INDEPENDENT CONTRACTOR" with its own ICC operating authority

Carrier Understands that all permits and taxes are its sole responsibility.

Carrier agrees that it maintains its own current Cargo, Liability and Workmans Comp Insurance. Directions provided by AMERICAN RIDGEBACK LLC DBA AR LOGISTICS or its Customers either orally and/or written are for informational purposes only. It is the Carriers sole responsibility to confirm that it may lawfully operate a loaded vehicle of any weight, commodity or dimension over the road, highway,

https://mail.google.com/mail/u/0/?ui=2&ik=c61c93a12&jsver=1QCYKmI4kI-en.&view=pt&search=inbox&th=1609380c215c7c7b6&siml=1609380c215c7c7b6

12/27/2017

Gmail - Fwd: American Ridgeback LLC dba AR Logistics - Carrier Load Rate Confirmation (ARLG-01.2424G3)

bridge or route. Carrier shall be solely responsible for any fines, penalties or citations occurring as a result of operating any vehicle over any road, highway, bridge or route in violation of any regulation law or ordinance.

Carrier must advise AMERICAN RIDGEBACK LLC DBA AR LOGISTICS of any and all accessorial charges or other charges in excess of and/or in addition to the agreed rate set forth in this or any Rate Confirmation sheet within 24 hours after delivery of such shipment. Failure to provide such information could result in the failure of AMERICAN RIDGEBACK LLC DBA AR LOGISTICS to collect for such charges and therefore payment to Carrier shall be at the sole discretion of AMERICAN RIDGEBACK LLC DBA AR LOGISTICS.

Pursuant to the Carrier Contract Agreement, Carrier cannot double broker out this, or any other load. If the carrier double brokers this load to an unrelated third party, AMERICAN RIDGEBACK LLC DBA AR LOGISTICS is hereby authorized to pay the actual carrier hauling the load.

Carrier agrees that only AMERICAN RIDGEBACK LLC DBA AR LOGISTICS will schedule pick up and deliver appointments and any changes must be made by AMERICAN RIDGEBACK LLC DBA AR LOGISTICS. Carrier assumes responsibility for any and all charges, including, but not limited to, detention, if it reschedules or misses an appointment set by AMERICAN RIDGEBACK LLC DBA AR LOGISTICS.

Carrier Signature: _____

Please complete the attached ACH Credit Authorization document and return with the signed rate confirmation to receive your payment electronically. If payment is required in the form of a Paper Check, a $2.00 fee will be applied.

Page 2 of 2

https://mail.google.com/mail/u/0/?ui=2&ik=d811d3ae1218&jsver=1GCYKobdiAA.en.&view=pt&search=inbox&th=1609985c15c7c7fd&simi=1609985c15c7c7fd

Gmail - Fwd: American Ridgeback LLC dba AR Logistics - Carrier Load Rate Confirmation (ARLG-01-242463)



Powered by BAMwire™

TRANSFLO EXPRESS®
Trip Sheet

Scan all related trip Documents to
include SIGNED CLEAN BILL OF
LADING at any TRANSFLO
Express™ Truckstop or email
documents to
transflo@bamwire.com

**"IN ORDER TO RECEIVE PAYMENT WITHIN SPECIFIED TERMS OF YOUR RATE CONFIRMATION,
PLEASE SEND THE SIGNED CLEAN BOL, INVOICE, AND RATE CONFIRMATION THROUGH THE
TRANSFLO SYSTEM or VIA EMAIL to transflo@bamwire.com**

Date:
Tractor/Trailer No.:
Frt Bill / PRO #:

Driver:
Internal No:
Misc:

## Instructions

1) Go to a TRANSFLO Express™ Truck stop Scan location. You can find a list of scan locations at www.transfloexpress.com. Any Pilot or
Loves locations have the truck stop scanning capability

2) One tripsheet per load and one load per scan which should be done as soon as practical after the trip is completed. Truck stop scanning
will drive the Billing and Driver Payroll process, so please do not keep in your possession more than one trip at a time which has not
been truckstop scanned.

3) Proceed to the fuel desk and hand your documents to the cashier. You won't need any cash. Put this tripsheet on top, and make sure
documents are all facing the same direction, tops are lined up correctly, and all staples and paperclips are removed.

4) If you have small receipts that you will be submitting, they should be grouped with like document types and taped to a regular sized
sheet of paper. You can get paper and tape at any TRANSFLO Express™ Truck stop location. Cashier will scan documents for
you. It should take about one minute.

5) Cashier may ask you for the fleetid. If asked, tell the cashier the fleetid is found under the barcode on the page. The cashier will then
enter the fleetid.

6) Upon completion of the scan process, the cashier will return your original documents, AND a confirmation receipt.

7) Review the confirmation receipt to ensure that the page count is correct.

8) You may view the images on the TRANSFLO Express™ Confirmation Viewer by logging on to www.transfloexpress.com and clicking
the "View Documents" link in the top right corner. Once there, simply type the confirmation number in the 4 boxes as it appears on your
receipt. You can document delivery, view the images, and save or print the images from this website.

12/27/2017

https://mail.google.com/mail/u/0?ui=2&ik=4f51c93a12f8&jsver=1QCYKcnliAA.en.&view=pt&search=inbox&th=1609a9b5c15c7c7f0&siml=1609a9b5c15c7c7f0

Gmail - Fwd: American Ridgeback LLC dba AR Logistics - Carrier Load Rate Confirmation (ARLG-01.242463)

## AUTHORIZATION AGREEMENT FOR DIRECT DEPOSITS (ACH CREDITS)

Company Name _____ FEDERAL ID Number _____

I (we) hereby authorize EAM Worldwide, LLC _____ Hereinafter called COMPANY, to initiate credit and, if necessary, debit entries and adjustments for any credit entries in error to my (our); (select one) Checking Account or Savings Account indicated below, at the depository Financial Institution named below, and to credit or debit the same from such account. I (we) acknowledge that the authority will remain in effect until I have (or either of us) cancelled it in writing and that the origination of ACH transactions to my (our) account must comply with the provisions of U.S. law.

Financial Institution _____
City _____ Branch _____
State _____ Zip _____
Routing _____ Account _____
Number _____ Number _____

This authorization is to remain in full force and effect until COMPANY has received written notification from me (or either of us) of its termination in such time, and in such manner as to afford COMPANY and Financial Institution a reasonable opportunity to act on it.

Name (s) _____ Signature _____
Date _____

IF YOUR COMPANY USES A FACTORING SERVICE, PLEASE COMPLETE THE ABOVE PAYMENT INFORMATION WITH THE FACTORING COMPANIES INFORMATION!!!!!!

In order to avoid a $2.00 check fee, please complete this form and

https://mail.google.com/mail/u/0?ui=2&ik=6b1c93e126&jsver=t3OYKmiIdvI.en&view=pt&search=inbox&th=1609905e15c7c7fd&siml=1609905e15c7c7fd

# APPENDIX G

**From:** Todd Hammerstrom <todd@firststarllc.com>
**To:** John Husk <johnhusk@aol.com>
**Subject:** Fwd: FW: Operations
**Date:** Thu, Feb 1, 2018 4:17 pm

---------- Forwarded message ----------
From: **Mike Rieck** <mrieck@firststarllc.com>
Date: Thu, Feb 1, 2018 at 4:07 PM
Subject: FW: Operations
To: Todd Hammerstrom <todd@firststarllc.com>


See Below



### Mike Rieck

**Business Development Manager**

T: 812-496-3296 | M: 513-404-4949 | F: 812-669-4378

E: mrieck@firststarllc.com | W: www.firststarlogistics.com



First Star LLC is an Asset Based company with available Trucks Nationwide!


**From:** Mike Rieck
**Sent:** Wednesday, December 20, 2017 6:04 PM
**To:** Raul Victores <raul@firststarllc.com>
**Cc:** Adam Mersch <amersch@firststarllc.com>
**Subject:** Operations

EFILED 02/16/2018 02:35 PM / CONFIRMATION 703697 / A 1800925 / COMMON PLEAS DIVISION / IFIJ

2/1/2018, 4:28 PM

Raul,

   After reviewing accounts/transactions, we discovered multiple billing issues, claims, customer payments, and other problems. We have decided to cease operations effective immediately between yourself and First Star, until further notice. We are investigating more into these problems as we feel some of these may have been done intentionally. Please don't represent yourself as an agent for First Star or any connections to the First Star Organization effective immediately, until further notice. We will update you along the way as we find more information. Let me know if you have any questions. Thanks



**Mike Rieck**

**Business Development Manager**

T: 812-496-3296 | M: 513-404-4949 | F: 812-669-4378

E: mrieck@firststarllc.com | W: www.firststarlogistics.com



First Star LLC is an Asset Based company with available Trucks Nationwide!